Pee Cueiam: This case was referred to Trial Commissioner Saul Bicbard Gramer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Buie 134(h). The commissioner has done so in an opinion and report filed on April 16, 1971, wherein he concluded “that defendant has failed to meet the burden of proof * * * that plaintiff * * * ‘corruptly’ practiced or attempted ‘to practice any fraud against the United States in the proof, statement, establishment, or allowance’ of the claim herein” and recommended that judgment be entered for plaintiff in the amount of $216,574.53. Plaintiff and defendant each obtained an extension of time to file a notice of intention to except to the commissioner’s report and recommendation but neither filed such notice or any exception. On May 28, 1971, the parties filed a stipulation of settlement wherein, among other things, it is stated that the “stipulation is made for the purpose of enabling the court to enter judgment in favor of plaintiffs and against the defendant in the sum of $216,574.53 and to dismiss, with prejudice, the defendant’s plea in fraud.” Subsequently, on June 14, 1971, for plaintiff and June 15, 1971, for defendant, each party filed a motion for enlargement or extension of time to file a notice of intention to except to the commissioner’s report, reciting therein the filing of the stipulation of May 28, 1971 and the fact that it had not yet been acted upon by the court.
*377 Since the court agrees with, the commissioner’s opinion, findings and recommended conclusion of law, it hereby adopts the same, without oral argument, together with the stipulation of the parties, filed May 28, 1971, as the basis for its judgment in this case. Therefore, plaintiffs (trustees in dissolution) are entitled to recover, judgment is entered for plaintiffs (trustees in dissolution) in the sum of $216,574.53 and defendant’s plea in fraud is dismissed with prejudice.
OPINION OP COMMISSIONER
Gamer, Commissioner:
Daniel J. Cronin, Inc. (hereinafter sometimes referred to as “Cronin”), was a New Jersey corporation which, on May 11, 1951, entered into a $6,580,000 lump sum contract with defendant, acting through the Bureau of Yards and Docks, Department of the Navy, to perform certain construction work at the United States Naval Aeronautical Turbine Laboratory, Trenton, New Jersey. The work was described as the construction of a “High Pressure Blower Wing, Test Wing and Miscellaneous Construction.” The project in effect constituted a laboratory for the testing of turbo prop and turbo jet airplane engines under simulated flight conditions. Cronin’s work principally consisted of the erection of several buildings and the installation of an electrical distribution system and mechanical piping, including piping running between and connecting the buildings. Various complicated machines and pieces of equipment were to be installed in and around the structures which Cronin was to build. Most of these quite sophisticated machines and equipment items were to be furnished and installed by defendant. However, defendant acted through separate contracts with third parties under which such parties undertook to manufacture and install the machines and equipment. Included in Cronin’s work was the construction of the foundations for such machines and equipment. After the installation of such machines and equipment by defendant (i.e.: the third parties) , it was then Cronin’s responsibility to connect them to the piping. Thus, by reason of defendant’s undertaking the furnishing and the installation of the machines and equipment in and around the buildings and on the foundations which Cronin was to construct, there was cast upon defendant *378 the burden of effecting a rather intricate type of coordination between Cronin’s construction work and the work of the third-party machine and equipment contractors.
Cronin’s contract called for the completion of its work within 450 days after receipt of the notice of award. The receipt of such notice on May 11,1951 fixed August 3,1952 as the completion date. There was, however, an extraordinary time overrun of almost four years, the contract work not being finally accepted until June 28,1956, or 1,423 days after the original completion date. Cronin, was granted time extensions for the full overrun period, thus being relieved of any liability for liquidated damages (the contract rate being $1,200 per day).
Luring the course of construction, Cronin frequently complained about delays to and interference with its work allegedly caused by defendant. In addition, defendant initiated a very large number of changes and there was much controversy over the proper amount of compensation therefor. To help him decide the claims which Cronin submitted, at that time (1954) amounting to over $850,000 for the time overrun and almost $900,000 for increased change order compensation, the contracting officer appointed, at different times, two boards to investigate the claims and make recommendations with respect thereto. Thereafter, the contracting officer made certain allowances in connection with the change orders and disallowed the time overrun claim on the ground that it was a claim in the nature of damages for breach of contract, not compensable under the contract provisions. Cronin’s appeal to the Armed Services Board of Contract Appeals resulted in additional change order allowances but the Board dismissed the claims for delay as being beyond its jurisdiction.
Thereafter, Cronin filed an 82-page petition herein, consisting of 141 paragraphs, contending that the entire 1,423-day overrun was wholly attributable to scores of breaches of contract committed by defendant and claiming damages with respect thereto in the amount of $1,045,000. However, only one change order claim in the amount of approximately $15,600 is set forth in the petition.
As part of the pretrial proceedings, there was issued, under the court’s rules, a pretrial order addressed to the issue of *379 damages for the delays allegedly caused by defendant. The order directed Cronin to furnish to defendant, with respect to such of the damages as were based on Cronin’s books of account or other records, a statement showing the items and figures appearing in such books and records which Cronin intended to prove, and to make such books and records available for examination by defendant. In accordance therewith, Cronin submitted various accounting schedules detailing the basis of its claimed damages. The pretrial order also directed defendant, upon such submission by Cronin, to examine the books and records upon which the Cronin accounting schedules were based, and then, in turn, to submit to Cronin schedules showing the results of defendant’s examination, including an explanation of any differences between its schedules and Cronin’s.
Pursuant to the pretrial order, defendant (through four Special Agents of the Federal Bureau of Investigation, Department of Justice) examined the books and records of Cronin upon which the damage schedules had been based. Upon receiving the results of their examination, defendant came to the conclusion that certain of the Cronin damage schedules included, as alleged legitimate expenses of contract performance by the corporation, expenditures which were in fact the personal indebtednesses of its officers. Defendant further became convinced that there had also been included in such schedules, as such alleged legitimate contract expenses of the corporation, payments to certain of its officers and employees which were in fact reimbursements to them of the federal and state tax withholdings that the corporation had made on their salaries. As a result, defendant, on June 27, 1962, amended its answer so as to include therein a special plea in fraud wherein it requested the court to render judgment of forfeiture pursuant to the provisions of 28 U.S.C. § 2514 (1958) ,[1] Attached to the plea was a list of 505 “specific *380 items” which were included in Cronin’s schedules and which were alleged as not having been a “part of the expense” of performing the contract. By a second amendment of January 14,1964, defendant added five more items to its fraud plea.
During the major period of performance of the instant contract, Cronin was a family corporation, all of whose stock was owned by Daniel C. Cronin, his wife Julia, and their son John, who was the active, operating head of the company. (On July 16,1954, all of the stock was transferred to John.) By 1958, the corporation’s finances had deteriorated, and in 1959 a plan for arrangement under the Bankruptcy Act was filed and adopted by the United States District Court for the District of New Jersey on June 30,1959. Under the terms of the plan, the Cronins resigned as officers and all of the company’s stock was transferred to the Standard Accident Insurance Company, the surety on the contract. Except for the settlement of its financial affairs, the corporation became defunct. The petition herein, filed on October 26, 1959, after the surety had succeeded to the ownership of the corporation’s stock, is part of the attempt to effect such settlement.[2] To assist it in prosecuting the claim of this defunct corporation, the surety retained the company’s former project manager, Boy S. Eyre, who had been with Cronin ever since June 1951. He was the company’s project manager not only on the instant contract but on all the other company projects as well. As such, he became quite familiar with the company and its operations and appeared to the surety to be the most qualified former employee of the company capable of so assisting it. It was he who had prepared the damage schedules which led to the filing of the fraud plea.
On November 30, 1965, the Cronin corporation was dissolved under the laws of the State of New Jersey, with its interest in the claim herein being transferred to named trustees in dissolution for the corporation. These trustees have been substituted as the parties plaintiff herein. However, for convenience, as used herein “plaintiff” will refer to Daniel J. Cronin, Inc., the original plaintiff.
*381 The taking of testimony with respect to each of the multitude of incidents claimed by plaintiff to constitute breaches of the contract over the approximately five years of contract performance and the damages allegedly flowing therefrom, as well as with respect to the great bulk of the 510 individual items claimed by defendant as having constituted attempts by plaintiff to practice fraud in the establishment of its claim, generated an enormous trial record. Almost 12,300 pages of testimony were taken during approximately 18 weeks of trial, and around 2,800 exhibits introduced. The parties agree that the claim with respect to the one change order which is still in dispute is to be handled by the court upon the basis of a review of the administrative record under the Wunderlich Act (41 U.S.C. § 321-22 (1964)), which added over 760 pages of Board testimony for the court’s consideration. The parties’ requested findings of fact and briefs with respect to all the issues total almost 1,900 pages.
THE BELAY CLAIM
The record fails to support plaintiff’s basic contention that the entire lengthened period of performance is attributable to defendant’s breaches o'f the contract.
Plaintiff has presented evidence concerning a great number of incidents which occurred from the very beginning of the work and continued throughout performance, each of which it contends resulted in delays for which defendant is liable. Such incidents relate to practically every step in the construction sequence of each of the various buildings and installations comprising the project, commencing with the excavation and the foundations, and going on to all of the succeeding operations, including the erection of the structural steel, the wall brickwork, the roofing, the miscellaneous ironwork, the electrical and mechanical work, the installation of the special type doors, and the painting. Among other things, plaintiff complains about delays attributed to erroneous, conflicting, and ambiguous drawings (allegedly resulting from the project’s having been hurriedly designed and prematurely let out for bids); delays in approving shop drawings; delays in delivering government-furnished mate *382 rial; delays in approving changes (allegedly dne, in part, to the necessity of defendant’s having to redesign the project constantly while the contractor was attempting to construct it); delays caused by the making of ordered changes (exception being taken to changes ordered after the original work in question had already commenced); delays resulting from interferences from the other contractors also working on the project (exception being taken to defendant’s alleged wrongful action in preferring the other contractors’ operations to plaintiff’s); and delays due to defendant’s failure to coordinate properly the work of the various contractors.
The evidence, however, demonstrates that many of the incidents relied on by plaintiff were isolated and nonsequential, and therefore could not possibly have caused any significant delay in the overall progress of the project. Furthermore, with respect to the great bulk of such incidents, plaintiff has failed to prove, or indeed even to attempt to prove, the crucial fact of the specific extent of the alleged wrongful delay to the project operations caused thereby. For the most part, it has not even attempted a reasonable approximation based upon some rational theory. Instead, plaintiff typically relies on each instance as constituting wrongful action which “contributed to the delayed completion” of the particular building or installation “and of the project as a whole,”[3] without indicating whether such “contribution” was one day, thirty days, or any reasonably accurate period of time. Plaintiff simply takes the original and extended completion dates, computes therefrom the intervening time or overrun, points to a host of individual delay incidents for which defendant was allegedly responsible and which “contributed” to the overall extended time, and then leaps to the conclusion that the entire overrun time was attributable to defendant.
On this record this “total time” theory cannot be accepted. Such proof of delay is ordinarily as unsatisfactory as the “total cost” method of proving damages. “A Total time’ approach is no less susceptible to inaccuracies than the total-cost theory.” WRB Corporation v. United States, 183 Ct. Cl. 409, 427 (1968).
*383 In addition to the hereinabove-mentioned failure of the proof to support any material delay flowing from many of the incidents relied on, there are other factors which compel the conclusion that “[p]lamtifl’s presentation does not support” the “dependability here” of the total time theory. Id. The record shows that a good part of the extended period of time was not attributable to any breach of the contract by defendant. For one thing, this contract contained, as Article 10, a “Changes and Extras” provision which permitted the contracting officer “at any time or times * * * [to] make changes in the drawings or specifications Of this contract and within the general scope thereof,” and to mate equitable adjustments to cover any increases in cost and additional performance time. There were a large number of such changes ordered. However, plaintiff specifically disclaims any contention that defendant abused such contract right to make changes either by reason of the number issued or their scope, i.e., that they amounted to a cardinal contract alteration, and consequently beyond the allowable limits of the article. Accordingly, no damages can be recovered for the exercise by defendant of its reserved contract right to make changes and, consequently, for the extra time required to perform the changed work. United States v. Rice, 317 U.S. 61 (1942); Mount Vernon Gontraeting Oorp. v. United States, 139 Ct. Cl. 688, 153 F. Supp. 469 (1957). Where the contractor agrees thereto, the compensation fixed by the change order to cover his increased costs and the extension of contract time to perform the changed work give him all to which he is entitled. Magoba Construction Co. v. United States, 99 Ct. Cl. 662 (1943). As stated, of the many changes ordered by defendant on this contract, plaintiff is contesting only one. Consequently, as the court held in John McShain, Inc. v. United States, 188 Ct. Cl. 830, 835, 412 F.2d 1281, 1285 (1969): “Because of the many delays flowing from the numerous change orders for which plaintiff has already been compensated, it would be improper to adopt plaintiff’s contention that the contract period as a whole must be used in computing the delay involved.”
While plaintiff makes no complaint either with respect to the number or scope of the changes, it does contend that *384 defendant abused the right to make them by ordering changes, often in piecemeal fashion, after construction of the portion of the work involved in the change commenced, thereby causing disruption in plaintiff’s original planned sequence of operations. The contention is that had the changes been ordered prior to the commencement of the particular part of the operations involved, they could have been easily incorporated in the planned sequence, and the contractor could then have proceeded efficiently and without interruption. However, since Article 10 specifically authorizes the making of changes “at any time or times,” the contention lacks merit. If defendant orders a change after the portion of the work involved has already commenced, then some work already accomplished and paid for may have to be removed and redone. This may well make the change more expensive to accomplish than had it been ordered before the work commenced. But if the contractor is adequately compensated therefor, the timing of the change cannot, under the article here involved, be the basis of a breach of contract contention. “We know of no contract requirement or any obligation imposed by law which restricts the government’s power to order changes within a specified period.” J. D. Hedin Constr. Co. v. United States, 111 Ct. Cl. 70, 106, 347 F. 2d 235, 258 (1965). Where a contract contains a “Changes” article such as the instant one, a contractor is not justified in believing that he will be able to proceed from the beginning to the end without interruption. Magoba Construction Co. v. United States, supra at 690.
Another example of time improperly included by plaintiff in its total time computation pertains to the question of shop drawing approvals, which is a major issue in this case. In a host of instances, plaintiff complains about the length of time defendant took to approve shop drawings and constantly points to the alleged unduly long period between submission and approval. However, the mere fact that defendant took four weeks, or four months, or even longer, is in itself meaningless. The length of time is meaningful only in relation to the effect it had on the project operations. If the particular item of work involved, because of its proper sequence, and considering the then state of the project, is *385 not to be accomplished until six months later, taking four months to approve it may not be unreasonable. In other situations, one month or even less might be unreasonable. The proof here shows numerous instances in which the shop drawings defendant was holding related to work to be done far in the future. Therefore, their retention did not serve to impede the construction operations. Although held a seemingly long period of time, the drawings were, in the great bulk of the instances about which plaintiff complains, nevertheless approved in ample time prior to the point in the construction sequence when the part of the work involved had to be performed, thus resulting in no delay to the ultimate completion of the project. The length of time taken to give approval does not “establish ipso facto an unreasonable delay on the part of the defendant.” It is the contractor’s burden to show “where the work was delayed because of lack of approval.” Jefferson Constr. Co. v. United States, 177 Ct. Cl. 581, 595-96, 368 F. 2d 247, 256 (1966).
Further illustrating the impropriety of applying plaintiff’s total time theory to this case is the fact that the record clearly shows that a portion of the extended contract time for which plaintiff sues is delay for which plaintiff itself (or its subcontractors) is responsible. For instance, the evidence demonstrates that the progress of the mechanical work was delayed in part due to the mechanical subcontractor’s inactivity, as well as its undermanning of this portion of the work.[4] Similarly, there was inexplicable delay attributable to a sub-subcontractor on the electrical work.[5] The findings of fact herein, which consider each incident upon which plaintiff bases its 1,423-day delay claim, show other instances of inexplicably lengthy periods consumed by plaintiff and its subcontractors in the performance of their work.[6]
Thus, in considering the overall extended contract period for which plaintiff sues, we are faced with a conglomerate mass of individual incidents the bulk of which involve inde *386 terminate periods of time or periods which cannot possibly be charged to defendant as breaches of the contract. Accordingly, plaintiff’s basic claim of damages for the full time overrun of 1,423 days cannot be sustained.
In Great Lakes Construction Co. v. United States, 95 Ct. Cl. 479 (1942), where the court referred to proof similar to that here involved as “blanket proof,” the contractor failing to prove “the fact that any one or more of the asserted faults of the defendant caused any specific delay * * *” (at 502), the court dismissed the entire delay claim, holding that “[t]here is no satisfactory evidence * * * that because of certain specified conduct on the part of the defendant, certain work of plaintiff was delayed by a certain number of days * * (at 503). Delay claims supported only by a total time theory grounded upon a number of alleged incidents, without a satisf actory showing of the extent of the actual delay caused by any of such incidents, were also dismissed in Jefferson Constr. Co. v. United States, supra;[7] Commerce International Co. v. United States, 167 Ct. Cl. 529, 545-46, 338 F.2d 81, 91 (1964);[8] and George J. Grant Constr. Co. v. United States, 124 Ct. Cl. 202, 205-06, 109 F. Supp. 245, 246 (1953).
However, to dismiss the delay claim in its entirety in this case because plaintiff erroneously has grounded it upon the total time theory would manifestly be unfair. This is so because, with respect to some of the individual incidents of which plaintiff’s overall claim is composed, an examination of the record shows it to be sufficient not only to substantiate the contention that defendant did cause actionable delay but also to ascertain with a reasonable degree of accuracy the *387 extent of sueih. delay to the project as a whole. As was stated concerning the analogous total cost damage problem in Boyajian v. United States, 191 Ct. Cl. 283, 254, 423 F. 2d 1231, 1244 (1970) : “In situations where the court has rejected the ‘total cost’ method of proving damages, but where the record nevertheless contains reasonably satisfactory evidence of what the damages are, computed on an acceptable basis, the court has adopted such other evidence * * Indeed, defendant in effect admits that the record does support some measure of recovery on certain of the matters about which plaintiff complains.[9]
The separate findings of fact herein set forth the 148 individual alleged delay items upon which plaintiff’s claim rests. The reasons why most of them do not qualify as items of recovery, either because no actionable breach on defendant’s part is shown, or because no reasonably accurate extent of the alleged delay attributable thereto is ascertainable, or both, are in each instance indicated. Such reasons for the most part 'are founded on factual considerations and to discuss all of such matters here would largely amount to a duplication of the findings. Accordingly, there will be here set forth, in the order in which they have been presented by the parties, only the relatively few items (16) upon which plaintiff is entitled to recover'.
THU ALTITUDE CHAMBER HOUSE
One of three connected buildings constituting the “Test Wing” of the project was an “Altitude Chamber House.” This building was to contain two “altitude chambers” which were included in the equipment indicated in the specifications that would be “furnished and installed” by the Government. The descriptive list of such equipment contained in the specifications indicated that these chambers were being manufactured under a contract between the Navy and the Foster-Wheeler Corporation. Air from blowers driven by 6,000-horsepower motors contained in a building called the “High Pressure Blower Wing,” which air was first dehumidified and then either heated (up to 190 degrees) or cooled *388 (down to 67 degrees below zero) in “rigs” (a certain type of chamber), passed into these altitude chambers where jet engines could then be tested under simulated flight conditions from sea level to an altitude of 65,000 feet. The building, three stories high and resting on concrete footings, had a structural steel frame and brick walls. Under a sequence of work established by defendant (which differed from the sequence plaintiff originally planned), this building was the first that plaintiff was to erect.

The FomdaMon Anchor Bolts

A part of each altitude chamber was its “inlet portion.” As stated, plaintiff was to construct the foundations for the government-furnished equipment. In this instance, the foundations for such inlet portions constituted a part of the foundations for the Altitude Chamber House itself. The reason for defendant’s requiring plaintiff to construct the Altitude Chamber House first was the expectation of the Officer In Charge of Construction (OINCC) at the site that the altitude chambers would shortly be ready for delivery by Foster-Wheeler. At a conference on June 29, 1951, the OINCC informed plaintiff that the inlet portions of both altitude chambers would be delivered to the site within a week and that plaintiff had to have the foundations therefor ready to receive such equipment. Before proceeding with the foundations plaintiff was required to have its reinforcing steel shop drawings approved, but because of its accelerated schedule, defendant waived such approval for the part of the foundations upon which the inlet portions would be installed. Furthermore, the anchor bolts for the altitude chambers, which were to be embedded in the concrete foundations for the chambers, were, under the contract, to be supplied by defendant, and at the conference defendant agreed to furnish such bolts promptly since the foundations could not be poured without them.
Although plaintiff commenced its foundation operations as directed, the anchor bolts were not delivered to the job until July 27 and 31,1951. Furthermore, some bolts included in the shipments were incorrectly fabricated, and other essential bolts were missing. To end the delay, defendant, on August 1, *389 1951, directed plaintiff to secure the necessary bolts and plaintiff was, by August 8,1951, able to obtain them. It could then proceed with the foundation work.
When defendant, on June 29, 1951, ordered plaintiff to have the foundations for the inlet portions ready in a week and agreed, in connection therewith, to furnish the anchor bolts required for such work promptly, plaintiff was justified in expecting the receipt of the bolts in a day or two {i.e., by July 1,1951), so that it could proceed with its foundation operations without interruption. The delay in the furnishing of the bolts by defendant, and the further delay caused by requiring plaintiff itself to obtain some of them, resulted in a delay in the completion of the foundations for the inlet portions from July 1 through August 7,1951, a period of 38 days. Unexplained or unjustified failure to make timely delivery of government-furnished material resulting in delay to the contractor’s operations, is a breach of contract. Specialty Assembling & Paching Co. v. United States, 174 Ct. Cl. 153, 162, 355 F.2d 554, 560 (1966); Litchfield Mfg. Corp. v. United States, 167 Ct. Cl. 604, 338 F.2d 94 (1964). No explanation is here given or justification shown for this delivery failure. Delay at this early foundation stage necessarily resulted in corresponding delay in the completion of the building.

The Stop Order

On October 1,1951 plaintiff commenced erecting the forms for the concrete for a part of the Altitude Chamber House denominated the “fuel room.” This one-story room, situated on the first floor level of the House, extended from its north wall into the building for approximately 25 feet. Constructed entirely of reinforced concrete, the room also served as a support for the structural steel at the second floor level. It was necessary to complete this room before the structural steel frame of the building could be erected, and plaintiff planned to pour the concrete therefor simultaneously with the concrete for the balance of the foundations of the House {i.e., those in addition to the parts of the foundations which were to support the inlet portions of the altitude chambers).
On October 4, 1951, however, defendant, over plaintiff’s protest, directed plaintiff to cease its work on the fuel room *390 on the ground that it would interfere with the placement of the altitude chambers by Foster-Wheeler. As mentioned, the OINCC’s order to plaintiff on June 29, 1951 to proceed first with the construction of the Altitude Chamber House was based on the assumption that the chambers would be delivered within a week.[10] However, they were still not delivered by October 4, 1951, when plaintiff was ordered to stop work. Furthermore, on October 18,1951 plaintiff was ordered to remove the forms that had already been erected. By these orders, plaintiff was precluded from bringing any of the construction of the Altitude Chamber House above grade until Foster-Wheeler installed the chambers.
Foster-Wheeler did not complete the installation of the chambers until March 5,1952, and on March 12,1952 defendant authorized plaintiff to proceed with its work on the fuel room and the balance of the Altitude Chamber Blouse superstructure. Thus, defendant’s stop order was in effect from October 4,1951 until March 12,1952, a period of 160 days.
In justification for its action, defendant relies upon the fact that defendant’s contract with Foster-'Wheeler contained a provision that the walls and roof of the Altitude Chamber House would not be erected until after the chambers were installed on their foundations. However, plaintiff’s contract contained no similar provision, and plaintiff was neither a party to the Foster-Wheeler contract nor did it even know of the existence of such a provision therein. Indeed, plaintiff’s own contract in effect provided otherwise, «.<?., that it could proceed with the construction of its buildings unimpeded by the fact that machines or equipment were to be installed therein. Section 1-18 (b) of the specifications in plaintiff’s contract provided, with respect to the ‘‘Government Furnished and Installed Equipment,” that if such equipment were installed by defendant before plaintiff completed its work, plaintiff would be responsible for connect *391 ing it to tbe final piping (with plaintiff to furnish, and install all necessary piping and “adapters” therefor), but if such equipment were installed after the completion of the buildings, then plaintiff would have to return to effect such connections. The clear implication of this provision was that plaintiff would not have to wait in a standby status for equipment manufactured by others to be delivered and installed, but would nevertheless be obliged to do the final work of connecting the equipment to the piping whenever the equipment was installed, even though plaintiff later had to return to the building to make such connections.
There was nothing in the inherent nature of the altitude chambers which would reasonably put plaintiff on notice that it would not be possible for it to complete the building before they could be installed. The evidence shows that the installation could be made even though the building had been completed. This would require that the installation be made in sections rather than as complete units. Installation in complete unit form would, because of their size, necessitate their being swung into place without wall or roof interference. Sectional installation would, ho wever, be more expensive. The Foster-Wheeler contract provision that the walls and roof of the Altitude Chamber House would not be erected until the chambers were installed on their foundations was inserted as an addendum to the invitation for bids on such contract after Foster-Wheeler assured defendant that with such a provision, defendant would receive lower bid prices, reflecting the savings from fabricating and assembling the chambers in the manufacturer’s shop rather than in the field after erection of the building. But such a saving to defendant should not fairly accrue at the expense of another contractor equally well protected by contrary provisions in its contract. At the bidding stage, had plaintiff’s proposed contract called for the possibility of its construction operations being put on a standby basis for months while waiting for other contractors to deliver their equipment, rather than including the provisions of specification Section 1-18 (b), it is safe to assume that its bid (as well as those of the other bidders) would have been higher.
*392 Defendant’s further attempt to escape liability by placing the blame for the delay on Foster-Wheeler must also be rejected. Regardless of the Foster-Wheeler delay, plaintiff would not have been delayed at all had defendant, as indicated by specification Section 1-18 (b), permitted plaintiff to complete the building before the chambers were installed.
There is thus no justification shown for defendant’s causing this 160-day delay in the completion of the Altitude Chamber House. An unjustified stop order constitutes a breach of contract entitling a contractor to such damages as flow from it. Oliver-Finnie Co. v. United States, 150 Ct. Cl. 189, 279 F.2d 498 (1960).

The Brichworh

There were four sets of air-treating rigs or chambers, labeled “A,” “B,” “C,” and “D.” The three A rigs, in which the air was dehumidified, were located in the High Pressure Blower Wing. The three B rigs, in which the air could be refrigerated to 23 degrees below zero, were located north of such building between it and five “Brine Pumphouses.” The three C rigs and the two D rigs, in which air could be heated to 190 degrees above zero and cooled to 67 degrees below, were located north of the Brine Pumphouses, between such houses and the Test Wing, which consisted, as stated, of three buildings, i.e., the Turbo Prop Cell, the Turbo Jet Cell, 'and the Altitude Chamber House.
The delay in the construction of the superstructure of the Altitude Chamber House pursuant to defendant’s stop order posed a problem concerning the construction of the foundations for the C and D rigs and the installation of the rigs thereon. These foundations, which plaintiff was to construct, and the rigs themselves, would, by their proximity to the House, constitute obstructions to plaintiff’s construction activities on the House if they were to be constructed and installed prior to the resumption by plaintiff of its work on the House. Accordingly, when defendant issued the stop order, it assured plaintiff that the five C and D rig foundations would not be required to be built or the rigs installed by their manufacturer, Mehring & Hanson Company, until after the stop order was lifted and plaintiff had completed *393 the erection of the structural steel for the House. Mehring & Hanson had already completed the manufacture of the rigs and was prepared to proceed with their installation immediately. Nevertheless, over Mehring & Hanson’s protest, defendant caused it to delay such installation (and thereby made it unnecessary for plaintiff to build the foundations therefor). Defendant felt that, in its administration of the prosecution of its various contracts, it would not be proper to permit the placement of any unusual obstruction by any contractor to the work of any other.
The scheduling to effectuate this order of events called for the completion by plaintiff of the erection of the structural steel for the House, and the construction of the rig foundations thereafter, by June 15, 1952, following which Mehring & Hanson would then promptly install the rigs. After completing the foundations plaintiff would install a power hoist and such other equipment as would permit it to proceed uninterruptedly with the brickwork on the Altitude Chamber House (and the adjacent Jet Cell building).
Plaintiff did complete the structural steel erection and the rig foundations in early June 1952, well within the agreed-upon time schedule, and requested defendant to install the rigs, so that plaintiff could thereafter proceed with the brickwork as planned. It was then found, however, that another item of government-furnished equipment, i.e., a large steel frame structure referred to as an “orifice,” which was to be placed in the Turbo Prop Cell building by Byrne Doors, Inc., another one of defendant’s equipment contractors, was blocking Mehring & Hanson’s required work area.
Accordingly, new scheduling became necessary. Plaintiff could not erect its power hoist for the brickwork before Mehring & Hanson had installed the rigs. In the limited work area, the hoist would constitute an obstacle to Mehring & Hanson’s work. To press forward with the work, plaintiff decided, with defendant’s consent, to proceed immediately with the brickwork, by hand methods, on the lower portions of the Altitude Chamber House and to work upward until the hoist became necessary. It was hoped that the orifice would be out of the way and the rigs installed by the time such a hoist would be required. However, when plain *394 tiff reached such point, the orifice still had not been moved from the area, so plaintiff, again with defendant’s consent, transferred its brick operations to the adjoining Jet Cell building.
Byrne Doors’ operations were finally completed on July 7, 1952. In anticipation thereof, defendant directed Mehring & Hanson to commence its rig installation work on that date. There then followed a dispute between plaintiff and Mehring & Hanson concerning alleged obstacles to the latter’s work resulting from plaintiff’s brick piles and, despite another order by defendant to Mehring & Hanson on July 30, 1952 to install its rigs without further delay, Mehring & Hanson refused to do so unless plaintiff removed all o'f its bricks. This would have caused plaintiff to cease its brickwork. It was finally agreed that plaintiff would at least foe permitted to finish the part of the brickwork on the Jet Cell in which it was then engaged. This would deplete the brick piles to which Mehring & Hanson was objecting. Such brickwork was completed on August 25, 1952. Mehring & Hanson then moved in and completed the installation of the rigs on September 3. During the 10-day period from August 25 to September 3, 1952, plaintiff could accomplish no brickwork.
Plaintiff claims that the completion of the brickwork on the Altitude Chamber House was delayed by reason of defendant’s failure, in accordance with the agreed arrangement, to secure the installation of the C and D rigs promptly after plaintiff completed the erection of the structural steel and prior to plaintiff’s commencement of the brickwork. It says that prior installation o'f the rigs would have enabled plaintiff to erect a power hoist 'and would have permitted a speedier, more efficient brickwork operation than the hand operation it was forced to employ. Plaintiff seeks the “delay” time differential between the hoist method and the alternative method it had to adopt. As more fully set forth in the findings, the proof is not sufficient to sustain this portion of its brickwork claim.
Plaintiff is, however, entitled to recover for the 10-day stoppage on its brickwork operations. Had the rigs been installed as originally scheduled by defendant, i.e., promptly after plaintiff completed the erection of the structural steel, *395 plaintiff’s brickwork operations would have proceeded without interruption. It is not necessary to decide who was right in the subsequent dispute between plaintiff and Mehring & Hanson. While the contract (Article 4)- did provide that plaintiff “shall cooperate with other contractors of the Government * * * as may be required by the circumstances or directed by the Officer in Charge * * that officer did not direct plaintiff to remove its bricks and thus in effect stop its brickwork at an inappropriate point in the operation, nor could “cooperation” fairly be construed as requiring a cessation by plaintiff of its contract operations for substantial periods o'f time. In any event, the dispute would never have occurred had Byrne not frustrated the agreed-upon time schedule. Plaintiff had no responsibility for Byrne’s work. As government-furnished equipment, the installation of the orifice was, under plaintiff’s contract, defendant’s responsibility. Plaintiff could thus look to defendant alone for the timely installation thereof (as defendant had the similar right to look to plaintiff alone for the proper performance of plaintiff’s subcontractors). No explanation appears for the Byrne late performance. The installation by defendant of its equipment in such a manner and at such time as to cause a substantial work stoppage in plaintiff’s operations would not be warranted. It is an implied condition of every construction contract that neither party will do anything to hinder the performance of the other. Laburnum Construction Corp. v. United States, 163 Ct. Cl. 339, 325 F. 2d 451 (1963). By failing to effect timely installation of the government-furnished orifice and the C and D rigs, defendant upset the understanding it had with plaintiff as to the procedure that would be followed upon termination of the stop order, resulting in the stoppage on plaintiff’s brickwork operations. Indeed, since the new understanding or arrangement itself was necessitated by the wrongful stop order, this delay may also be considered as attributable thereto.
THE HIGH PRESSURE BLOWER WING
This building, containing the 6,000-horsepower motors previously referred to, was the largest of those to be con *396 structed by plaintiff, and was the next structure in the sequence of operations ordered by defendant. It was to be built with a structural steel frame on a concrete foundation, the walls being of brick and aluminum siding-. The foundations were originally shown on the plans as consisting of three main sections. The first section consisted of three “pits,” denominated the “B pits,” each about six feet deep and located at the north end of the building. The second section consisted of the foundations for the three hereinabove-men-tioned A rigs located just south of the B pits. The third section contained the foundations for the large blowers, and comprised more than 50 percent of the entire foundation area.

Oommeneement of the Exemation for the Foundations

The concrete foundations required a large quantity of reinforcing steel. This steel was to be fabricated from approved shop drawings. The excavation for the foundations was not to be commenced until these drawings were approved. After such approval and the completion of the excavation, concrete pours, incorporating the reinforcing steel, could then be made.
Plaintiff submitted the prerequisite shop drawings, identified as B-2 and B-3, on June 14, 1951. However, by July 3, 1951, they were still not approved and plaintiff’s letter of that date pointed out that defendant’s failure to act on these drawings was delaying the fabrication of the reinforcing steel and the commencement of the excavation operations. Defendant finally returned the shop drawings on July 9,1951. The drawings were marked “Hold” for elimination of the B pits and for certain changes which defendant was contemplating making in the foundations for the A rigs. Thus, although the hold prevented operations for the time being on the first and second sections of the foundations, comprising approximately the northern half thereof, it did permit fabrication of the reinforcing steel for the third and largest area and commencement of the excavation for such area (although engaging in such partial excavation operations on a building would normally not be considered to be economic).
These two shop drawings were key ones. Failure to act on them was holding up the commencement of the work on the *397 entire building. Considering their importance to plaintiff and the time defendant had undoubtedly already spent on the design of the foundations even prior to the invitation for bids, but also considering the scope and complexity of the particular foundation problems that were here involved, a reasonable time for defendant to have acted on the drawings was within ten days after their submission, i.e., by June 25,1951. Plaintiff reasonably did not anticipate that the approval of shop drawings submitted to carry out the project as designed when it was let out for bids would be the occasion for effecting important design changes, such as the elimination of the pits.[11] Defendant’s failure to act on these drawings until July 9, 1951 caused an unreasonable delay of 15 days in the commencement of the fabrication of the reinforcing steel and the excavation, i.e., from June 25 to July 9, 1951, and cor-relatively in the completion of the building. Failure to act with reasonable diligence on drawings submitted for approval by a contractor, resulting in a significant delay to project operations, constitutes a breach of contract. Vogt Bros. Mfg. Co. v. United States, 160 Ct. Cl. 687, 720, 722-23 (1968).

Foundation Delay Due To Hold Order

As stated, the “Hold” order on the A rig foundations and the B pits precluded plaintiff’s performing at that time any *398 foundation work on tbe northern half of the building. Despite the uneconomic nature of foundation work performed in piecemeal fashion, defendant directed plaintiff to proceed with the excavation work on the southern half, which contained the foundations for the blowers. For these foundations deep footings to bedrock were required. Plaintiff did proceed with such part of the excavation work as directed. In so excavating, a changed condition was encountered, requiring an increase in the depth of the excavation. The extra work involved an additional ten days and plaintiff received an equitable adjustment ($20,000) therefor.
The changes in the A rig foundations which defendant was contemplating were finally made by the issuance of revised drawings on August 9, 1951. These drawings also eliminated the B pits. Upon receipt of the drawings, plaintiff immediately commenced the excavation for the A rig portion of the foundations. However, despite the elimination of the B pits by the revised drawings, defendant informed plaintiff that the drawings in this respect were erroneous, and that such pits would in fact be required. Accordingly, plaintiff could still perform no excavation work on this portion of the foundations. The definitive data for the pits was furnished by plaintiff on September 17,1951, and plaintiff thereupon commenced its excavation of this portion of the foundations.
The piecemeal information given by defendant concerning first the blower foundations, then the A rigs, and then the B pits, compelled plaintiff to perform the excavation for the Blower Wing intermittently and, consequently, with reduced efficiency. The entire excavation work could not be completed until September 26, 1951. Had such work been performed as part of one operation by large crews, it should reasonably have required two weeks. Instead it took two months (which includes, however, the ten days for the changed condition). The placement of the concrete in the excavation was similarly affected. Such placement for the blower foundations commenced on August 10, 1951, for the A rigs on September 5, 1951, and for the B pits sometime after September 17, 1951. Concrete placement for the entire Blower Wing foundations could not be completed until November 9, 1951. Thus, the *399 concrete placement work, whicih reasonably should not have required more than one month, was stretched out over a three-month period, or sixty days extra (again including, however, the ten days for the changed condition).
Except for the ten days attributable to the changed condition, defendant is liable for the balance of the 50-day delay in the completion of the foundations. The hold order served to split plaintiff’s foundation operations and caused plaintiff to stand by an unreasonable length of time waiting for defendant to make up its mind as to what it wanted. First the B pits were in, then out, then in again. As stated, without compensation for the delays resulting therefrom, a contractor cannot be expected to stand by for long periods of time while defendant is engaging in design work of a type which presumably was settled before the contract was let out for bids. The reinforcing steel shop drawings were, as shown in the immediately preceding claim, held too long, unreasonably delaying the building at the initial excavation stage. The hold or stop order contained in such drawings when they were finally returned served further to delay the building at such foundation stage for another fifty days. The same 10-day period which would have been reasonable for the approval by defendant of the reinforcing steel shop drawings was also applicable to a determination of the A rig and B pit problems, for the foundation delays attributable thereto stemmed from the hold order contained in such shop drawings. Although defendant had the contract right to make the changes in the A rig foundations and the B pits, waiting until August 9,1951 and September 17,1951, respectively, to make them, was unreasonable. “There is * * * an implied obligation on the part of the United States not to cause unreasonable delay in making permitted changes in the contort, for the breach of which plaintiff is entitled to recover whatever damages it has suffered thereby.” J. A. Ross & Co. v. United States, 126 Ct. Cl. 323, 332, 115 F. Supp. 187, 191 (1953).

The Second Floor and Mezzanine Floor Slabs

The original plan of the second floor of the Blower Wing indicated a supervisory control room and an adjoining toilet room thereon.
*400 On March 5, 1952, plaintiff was notified that defendant decided to eliminate the toilet room and the partition between the two rooms, resulting in an enlarged control room. This change would also necessarily cause the elimination of the electrical and mechanical work pertinent to the eliminated room. However, defendant did not at that time supply any information concerning the nature of the work to be performed to replace the eliminated room. This information was a prerequisite to the construction of the slabs for the second and mezzanine floors, since electrical conduits and mechanical lines for the enlarged control room would affect such construction. For instance, such conduits and lines for such area might have to be embedded in the slabs.
On July 1,1952, plaintiff commenced work on such portions of the slabs which could not be affected by the change, since work on the control room could not otherwise commence. However, plaintiff could not complete such slab work for lack of the necessary information. In turn, the interior brickwork dependent on such slabs could not proceed.
Plaintiff did not obtain the required details concerning the change until August 8, 1952, when it received a revised drawing showing the work defendant desired plaintiff to install at the location in question. Following receipt of such data, the placement of the concrete for such slabs was completed on August 21, 1952, and the further construction operations for which the completion of the slabs was a prerequisite could go forward.
Although such slabs should reasonably have taken about four weeks to construct, because of defendant’s delay in furnishing the required information the work actually took seven weeks. There was thus a delay of three weeks, or 21 days, in the construction of these important, integral parts of the building, which delay resulted in a similar delay in the construction operations dependent on the completion of the slabs, and, correspondingly, in the final completion of the building. Such delay was solely attributable to defendant’s having delayed for the unreasonable time from March 5, 1952 to August 8, 1952, a period of over five months, in furnishing the necessary data. The period of almost four months *401 between March 5, 1952, when defendant decided to enlarge the control room, and July 1, 1952, when plaintiff commenced working on the slabs, was more than ample for defendant to have made up its mind and advise plaintiff as to what it wanted. Had it done so, no delay in the construction of the slabs would have been experienced.
Defendant points out that, as shown on the original plans, the only electrical work connected with the control room which affected the slab was a comparatively small conduit which ran from the power panel on the mezzanine floor. The apparent inference is that plaintiff should not have allowed such a relatively trivial matter to delay its work. The inference is unjustified. Plaintiff had no way of foretelling what additional work defendant’s revised plans might necessitate. It would therefore have been unreasonable to risk completing the slabs on a guesswork basis or prior to the receipt of the revised plans. Furthermore, even if such revised plans would again involve only such conduit, plaintiff had no way of knowing whether it was to be routed over, under, or through the slabs. Under the circumstances, it was justified in waiting until the revised drawings were submitted.
THE TURBO JET CELL BUILDING
This two-story building was one of the three connected buildings constituting the Test Wing, standing between the Altitude Chamber House and the Turbo Prop 'Cell. In this building turbo jet engines could be tested under simulated sea level flight conditions. The northern portion of the building, which was its larger part, was of reinforced concrete construction, the smaller southern portion being of structural steel and brick. In sequence, the construction of this building-followed the Blower Wing.

The Second, Floor Concrete Slab

After the construction of the foundations, the reinforced concrete walls enclosing the northern part of the building, and the concrete floor slabs therein, had to be constructed. The erection of these walls and slabs was the major operation in the construction of the building.
*402 By November 26, 1951 the work on. the first floor walls had progressed sufficiently for plaintiff to start the formwork for the second floor slab. On December 3, 1951 plaintiff was prepared to commence pouring the slab. Further work on the slab was frustrated, however, by defendant’s informing plaintiff on that day that changes would be made in certain of the sleeves which penetrated the slab. Plaintiff’s “Miscellaneous Sleeves Details” shop drawing covering the sleeves and penetrations in the walls and the second floor slab had been submitted on September 26, 1951 and approved by defendant on November 20,1951.
Since defendant could not at that time furnish plaintiff with the information concerning the proposed changes, plaintiff was obliged to cease work on the slab.
On January 7, 1952 plaintiff received the required data in the form of a revision of its previously submitted and approved shop drawing and the following day received clarifying final instructions. Plaintiff then immediately resumed the suspended work and completed the slab on January 11, 1952.
With plaintiff’s second floor slab work suspended on December 3, 1951, a speedy decision concerning the changes defendant desired to make was important. This slab was an integral step in the construction of the building. 'For one thing, the construction of all of the walls above the second floor in the large northern part of the building could not be undertaken until this floor slab was completed. Considering the time defendant had already spent in designing the sleeve penetrations, defendant having previously taken almost two months to approve the originally submitted shop drawing pertaining thereto, which 'also indicated thereon the changes defendant then desired (in addition to the original time that had been spent in designing the project), and also considering the nature of the problem, a reasonable time within which defendant should have made up its mind with respect to the further changes it desired to make in the shop drawing was, under the circumstances, five days. Thus plaintiff should have 'been given the necessary information by December 7, 1951. As it was, plaintiff did not have the data *403 upon which, it could complete the slaJb until January 8,1952. This constituted an unreasonable delay of 32 days in the completion of the slab, which delay in turn delayed the completion of the building for a corresponding time period.
Although defendant had the contract right to make changes, the taking of an unreasonable time to determine a change is a breach of contract. A contractor awaiting change instructions while his work is suspended may recover damages for the time exceeding what, under the circumstances, should have constituted a reasonable time. Langevin v. United States, 100 Ct. Cl. 15, 31 (1943) (under the circumstances involved, defendant should have determined a changed footing depth within three days). “It is settled that the defendant is allowed under the contract only a reasonable time within which to make permitted changes in the specifications and that the defendant is liable for breach of its contract if it unreasonably delays or disrupts the contractor’s work.” F. H. McGraw & Co. v. United States, 131 Ct. Cl. 501, 506-07, 130 F. Supp. 394, 397 (1955).
TUB TURBO PROP CELL BUILDING
This building, the next in the construction sequence, was the largest of the three comprising the Test Wing. The major portion of the structure contained the “prop cell” proper, in which propeller-driven engines could be tested at various simulated heights from sea level to 65,000 feet. This portion was of reinforced concrete construction. The remainder of the building, containing service and control rooms, was constructed of structural steel and brick.

The Air Evacuated Doors in the East Wall

The operation following the construction of the concrete foundations and footings was the erection of reinforced concrete walls enclosing the major portion of the building. These included long, high, east and west walls of the prop cell itself.
Dispersed throughout the length of the east wall were five entrances constructed with “air evacuated” doors. These were double sliding doors, one on each side of the one-foot thick wall. The doors were so designed that an evacuator pipe run- *404 ing through, the wall into the space between could be used to evacuate the air therefrom, thus creating a partial vacuum. Such space contained a motor (and bracket) which pumped the vacuum.
A shop drawing pertaining to these doors (as well as similar doors for the Jet Cell building) had to be approved by defendant, and plaintiff submitted the drawing on September 26, 1951. It would take about two weeks after approval to fabricate the piping which was to go into the walls.
By October 22, 1951 plaintiff was ready to proceed with the form and bracing work on the east and west walls (being steps preliminary to the pouring of the concrete), but it could not so proceed with the east wall because the evacuated door shop drawing had still not been approved. Plaintiff had to have definite information from defendant concerning the locations of the five doors and the related piping which was to be embedded in the wall.
Accordingly, on October 22, 1951, plaintiff commenced such bracing and formwork only on the west wall, which contained no openings. Not only did this produce a slower overall wall operation, but the separate, rather than simultaneous, construction of the walls delayed the construction of the concrete roof and the floor slabs, resulting in similar delay in the completion of the building. Despite plaintiff’s written request for prompt approval of the drawing, it was not approved until November 23, 1951. By this time, plaintiff’s forming and bracing work had already proceeded about halfway down the west wall. The drawing indicated several changes, including changes in the design, location, and size of the piping which was to 'be embedded in the east wall.
Plaintiff thereupon promptly had the piping fabricated and commenced the bracing and forming work for the east wall on December 5,1951.
As shown, the east wall evacuated door information was required by October 22, 1951, when plaintiff was ready to proceed with the wall work. Defendant had had the pertinent shop drawing for consideration since September 22, 1951. Considering the importance to plaintiff of commencing this *405 sequential item of work ¡at the same time as the west wall, defendant should have made up its mind concerning the changes it desired well prior to October 22,1051, in order not to delay plaintiff’s work and the completion of the building. There is no satisfactory explanation as to why the drawing could not have been so approved.
Defendant’s failure to furnish plaintiff with the necessary information until November 23,19,51 caused a delay in the completion of the east wall and, similarly, of the building, of 33 days, being the period from October 22 to November 23, 1951.

The FuelRoomEast Wall Stop Order

The parallel east and west walls hereinabove mentioned embraced not only the prop cell itself but also a “test fuel room” which was located on the east side of the building.
On January 2, 1952, when formwork for the east wall of the fuel room was in progress, defendant issued a stop order on further work on such wall. Under a separate contract between plaintiff and defendant, plaintiff was to furnish two exhaust silencers for the adjoining Turbo Jet Cell building. The Stop order was issued to give defendant further time to consider bow the work on the fuel room could foe coordinated with the design of the exhaust silencers.
The wall to which the stop order applied contained a door, referred to as Door No. 106, which was an outside entrance door. A shop drawing (referred to as “Hygrade’s No. 10”) covering the channel door buck for this door had been submitted by plaintiff on August 13, 1951, and, with changes indicated thereon, was approved by defendant on November 8, 1951. The door buck was thereupon fabricated. However, on December 4, 1951, defendant made further changes (relocation of hinges) to the door buck, which required it to be refabricated. The drawing showing the change was resubmitted by plaintiff on December 10, 1951, and again approved by defendant on December 18,1951. On ,January 2, 1952, when defendant issued the stop order, it was considering the possibility of making still further changes to the door to effect the hereinabove-mentioned design coordination.
*406 On January 23,1052, plaintiff received from defendant, in the form of a letter and sketch, the required data concerning the door. The only change made was the deletion of a transom. This deletion did, however, require another ref abri-cation of the door buck, constituting its third fabrication.
By the letter the stop order was lifted and plaintiff thereafter was able to resume its work on the wall.
Defendant, of course, had the contract right to make changes at any time. As an incident thereto, it also had the right to stop the portion of the work involved in the contemplated change in order to avoid the unnecessary expense that might be involved in having work done and then tom out. The delay occasioned by a stop order of this kind which is in effect only a reasonable period of time is not compensable. F. H. McGraw & Co. v. United States, supra. However, since defendant is allowed only a reasonable time within which to make permitted changes, in situations where a stop order is delaying construction on a substantial portion of a building a special obligation of diligence is cast upon defendant. Considering the fact that defendant had contemplated the door buck problem at least since the shop drawing was first submitted on August 13, 1951 (and presumably even before bids were invited on the contract), having twice made changes with respect thereto, and that, by its stop order, it was holding up construction on the entire east wall of the fuel room, no more than two days should reasonably have been taken by defendant to have made up its mind with respect to the comparatively simple matter of eliminating a transom. On this basis, plaintiff should have received the necessary information by January 4, 1952. It was consequently unreasonably delayed in its construction work on this portion of the building for twenty days, i.e., from January 4 through January 23,1952.
It is true that work continued on other portions of the Prop Cell building during the stop order period. However, this would noit serve to prevent the order from delaying the ultimate completion of the building by twenty days. The completion of this important wall portion of the building was still pushed twenty days away, as were the portions of the building dependent thereon.
*407 THE BRINE PUMPHOUSE BUILDINGS
This portion of tbe project, next in the order of construction sequence, consisted of four separated buildings. They were located north of the High Pressure Blower Wing, between such wing and the Test Wing buildings. Only one story in height, and therefore lower than the wings they stood between, they were designed with supports on their roofs which would carry the combustion air piping from the Blower Wing to the Test Wing, as well as other piping, i.e., recirculating, refrigeration, and steam. The buildings consisted of concrete foundations, brick walls, and a concrete and structural steel roof.

The Brick Walls

The walls of these buildings contained numerous penetrations to accommodate piping with channel rings and frames as liners. In addition, metal door bucks had to be installed in the walls. Accordingly, so that the brickwork could be performed in an orderly and efficient manner, it was necessary to obtain defendant’s approval of the shop drawings for the channel rings, frames, and door bucks before the brickwork could be commenced. Such approval would fix the locations and the dimensions of the openings in the walls. The doors, nine in number and all seven feet high, controlled a substantial portion of the brickwork in the buildings.
On July 25, 1951, plaintiff submitted the shop drawing (Hygrade’s No. 7) covering the rings and frames for all of the buildings on the project, including the Brine Pump-houses, and on August 13,1951, it submitted the shop drawing for the door bucks (Hygrade’s No. 8, which also covered the door bucks for the Altitude Chamber House). The latter drawing was returned by defendant on August 27, 1951 for certain corrections (mitering of the corners), defendant requiring resubmission of the drawing for approval.
On August 30, 1951 plaintiff, in an attempt to accomplish some brickwork (the concrete foundations and footings had been completed since August 8, 1951), initiated such work with small crews on the courses resting on top of the foundations, an area which was known would contain no penetra *408 tions or openings of tbe type involved in tbe drawings. By September 7, 1951 plaintiff could proceed no further in this respect.
On September 26,1951 defendant returned tbe sbop drawing covering tbe rings and frames wbicb plaintiff bad submitted on July 25, 1951. However, since defendant wanted five location and elevation changes in tbe penetrations, the drawing was not approved. Its resubmission was made on October 12, 1951, with tbe new locations and elevations indicated.
On October 18, 1951 plaintiff, again in an effort to accomplish whatever brickwork it could with tbe limited information available, commenced performing some work at points where it appeared there would be no penetrations or openings. Tbe performance of such work with small crews continually moving from place to place, and requiring tbe frequent moving of scaffolds, was inefficient.
On November 7, 1951 defendant approved tbe channel ring and frame sbop drawing, and on November 9,1951 also approved tbe resubmitted door buck sbop drawing. As of November 9, 1951, therefore, plaintiff was finally in possession of the data it required to construct tbe walls.
That plaintiff was unreasonably delayed by defendant to some extent is clear. Ascertaining tbe extent of such delay, however, is not easy, principally because plaintiff did, in an attempt to mitigate tbe delay, accomplish some brickwork during the delay period. However, it is believed that tbe extent of tbe delay determined in accordance with tbe following analysis produces a reasonably accurate result.
The buildings were ready to receive tbe brickwork on August 8,1951, when tbe foundations were completed. Nevertheless, plaintiff did not submit tbe door buck sbop drawing until August 13, 1951. Accordingly, tbe delay for which defendant would be responsible could not commence until plaintiff bad submitted the drawing and defendant bad bad a reasonable time within which to approve it. Since lack of such approval would bold up such an important portion of tbe project, and since defendant bad awarded tbe contract as long ago as May 10, 1951, with tbe construction *409 details presumably by then substantially determined, a reasonable time within which defendant should have acted upon the drawing was five working days, i.e., an approval should have been forthcoming by August 20, 1951. The disapproval of the drawing on August 27, 1951, for the mitering of the corners of the door bucks, a trivial matter, was, as in effect admitted by the OINCC at the trial, unreasonable, especially in view of the procedure which defendant had instituted, where only small changes were to be made, of approving drawings subject to correction, which type of approval permitted plaintiff to proceed immediately with the work as changed (even though a corrected shop drawing would later be submitted to reflect the changes).
The channel ring and frame shop drawing had been submitted ever since July 25, 1951, and considering its similar importance to the prosecution of the brickwork, action with respect thereto also should have been forthcoming at least by August 20, 1951. Thus, as of August 20, 1951, plaintiff should have been in a position to proceed with the brickwork with all necessary wall information and with full crews.
Since, as related, defendant was not able to make up its mind as to what it wanted with respect to the channel rings and frames until November 7,1951, and the necessary channel door buck data was not furnished plaintiff until November 9, 1951, defendant unreasonably delayed plaintiff’s efficient performance of the brickwork on the Brine Pumphouses from August 20,1951 to and including November 9,1951, a period of 82 days. As shown, however, plaintiff did perform some brickwork on 32 days during such period, i.e., from August 30 to September 7, 1951, and from October 18 to November 9, 1951 (the end of the delay period). Such work, limited and inefficient as it was, did serve to advance in some measure the completion of the buildings. The record does not accurately indicate how many days of brickwork time that could have been performed efficiently by full crews such work represented. However, it may reasonably be presumed that such work advanced the completion of the brickwork by 11 days, i.e., it took the small crews working as they did on 32 days *410 about three times as long to accomplish what full crews working efficiently would have accomplished. Accordingly, the efEect of defendant’s unreasonable delays, as above described, was to delay the completion of the Brine Pumphouses by 71 days, i.e., the above-calculated 82-day delay less the 11-day credit for work performed during such period.

The Roof Concrete Slabs

As mentioned, included in the equipment which was to be installed on the roofs of the Pumphouses were recirculating fans. These fans were to be anchored to concrete bases.
Defendant’s original design of the roof slabs indicated a thickness of about four inches. It was nevertheless obvious that four inches of concrete would not be sufficient to support the fans and the bases. Therefore, the original contract drawings were only schematic. The final design determination depended upon the size of the fans, which in turn affected the size of the bases. In this particular instance, the fans constituted equipment which was to be furnished and installed by plaintiff itself.
On November 28, 1951, plaintiff submitted the required fan drawings which provided the necessary size data, and defendant approved the last of the drawings on December 31,1951.
By February 1, 1952 the brickwork on the Pumphouses had advanced sufficiently to permit the erection of the structural steel, including the steel beams which served as supports for the roofs (as well as the supports for the mechanical piping passing over the roofs).
By early March 1952 the time was approaching when plaintiff would be ready to proceed with its work on the roofs of the buildings. The formwork on the slabs was to commence on March 6, 1952, the next steps thereafter being the placing of the reinforcing steel and the pouring of the concrete. However, plaintiff had not as yet been advised concerning what defendant wanted by way of the final design of those portions of the roofs upon which the fans and their bases were to rest. Although, as mentioned, the size of the fans had been approved since December 31, 1951, plaintiff still had only the original schematic drawings.
*411 On March 5, 1952, the day before plaintiff, under its schedule, was to commence the formwork, defendant, by a “preliminary letter,” advised that a revised drawing indicating the final design would soon be issued. The letter was accompanied by a revised drawing indicating certain changes in the schematic drawings. This preliminary revised drawing apparently was prepared and issued to enable plaintiff to accomplish some roof work pending the submission of the final design drawing. However, later that same day, plaintiff was directed to disregard such preliminary information because changes were going to be made in the preliminary revised drawing. Thus, it was not possible for plaintiff to proceed in any substantial way with the roof work. Commencing March 6, it did install some formwork but could not, for lack of any final design data, do any concrete pouring, nor did it have defendant’s approval of the reinforcing steel that would be an incident of the final design. On March 14, 1952 defendant ordered plaintiff to stop completely all roof work until the final revised drawings would be issued.
On March 24, 1952 plaintiff received the final drawings, and on March 27, 1952 defendant approved a shop drawing which previously had been submitted by plaintiff (on the basis of informal information theretofore received), which incorporated some, but not all, of the new features indicated on the final drawings. The drawing did enable plaintiff to have the reinforcing steel relating to the bases fabricated to conform to the changes. It was then necessary for plaintiff to submit a shop drawing indicating the balance of the design features set forth in the final drawings, which drawing was approved by defendant on April 7, 1952.[12] Due to the time required for the fabrication of the reinforcing steel and its shipment to the job, the first Brine Pumphouse roof could not be poured until April 16, 1952.
Defendant is responsible for this delay in the roof work. It had all the fan data required as early as November 28,1951, *412 when plaintiff submitted the fan drawings. Defendant certainly had ample time thereafter within which to decide on the design of the fan bases so as not to delay plaintiff’s construction of the roof. Had defendant acted within a reasonable time after November 28, 1951, or indeed even after December 81, 1951, when defendant approved the fan drawings, there would have been no delay in plaintiff’s construction of the roof. Such a reasonable time would have been approximately ten days, but even if defendant took considerably longer, there would still have been no delay since plaintiff was not prepared to proceed with the roof construction until March 6, 1952. However, any effective work plaintiff could accomplish commencing March 6, 1952 was in effect halted by defendant’s action of the previous day in rushing to plaintiff the “preliminary” letter and revised drawing indicating certain of the changes that were to be made in the schematic drawings, but then later in the day in revoking the drawing, thus leaving plaintiff with none of the essential data. Because plaintiff was not given the data necessary for the fabrication of the reinforcing steel until March 27,1952, nor the data concerning the final design features of the roofs until April 7,1952, plaintiff could not commence its pouring operations until April 16, 1952. Plaintiff was unreasonably delayed from March 6,1952 until April 16,1952, a period of 41 days, in the completion of the roofs and, consequently, the buildings themselves.

The Roof Insulation, Composition Roofing, and, Flashing

One of the final operations on the roofs of the Pumphouses was the placing of the roof insulation, the composition roofing, and the metal flashing. Plaintiff commenced this work on November 13,1952.
On each of the roofs there was to be located an item of equipment called a “characterized valve” resting on specially designed supports.[13] These supports had long been the subject of consideration by defendant. Over a year earlier, plain *413 tiff, on August 28,1951, had 'been ordered to hold up all work relating to the beams under such supports until further data was obtained from the valve manufacturer concerning the weight and dimensions of the valves, which data would control the design of the beams and supports. On October 15, 1951 defendant had supplied the necessary information to plaintiff, and plaintiff’s shop drawings relating to the supports were then approved by defendant on December 12, 1951, with further changes. Thus, at least 3*4 months’ consideration had already been given to the design of these supports — in addition to the time presumably originally devoted to the question before bids were invited.
On November 17,1952, however, defendant directed plaintiff to cease all further roof work because the design of the supports was again being revised, and all such work then ceased. Thereafter, on November 24, 1952, defendant furnished plaintiff with the details of the changes to the supports which it desired. The changes effected a redesign and relocation of the supports, necessitating plaintiff’s cutting out concrete work already installed. Upon receiving plaintiff’s cost estimate, defendant, the following day, ordered plaintiff to proceed with the changes, thus terminating the stop order.
In these circumstances, the stop order must be considered as unreasonable delay caused by defendant. It is not the change order itself which constitutes the breach because defendant had the contract right to make changes “at any time,” nor the extra time required to execute the change because compensation for that factor, including overhead, is cover-able by the change order. What does constitute the breach is the work stoppage resulting from the inordinate time taken by defendant to make up its mind with respect to the design of the supports. After taking around 3% months in 1951 to determine what it wanted concerning the supports, the matter was presumably settled. Despite this length of time, plaintiff, under a separate claim item, has here been allowed no recovery with respect thereto because no actual construction delay is shown to have resulted therefrom. It was, in effect, only a paper delay, for there was still ample time after December 12,1951, when the shop drawings were *414 filially approved (with, changes), to have the supports fabricated and brought to the site when they were required. However, when all the construction work on the roof was later actually stopped because it turned out that defendant still had not made up its mind concerning these supports, the delay due to the stoppage resulting from this continued deliberation must be considered compensable. Such lengthy consideration became unreasonable when it actually resulted in a work stoppage. This delay, occurring during the November 17-25, 1952 stop order period, amounted to nine days.
It is not meant to minimize the complex, technical, nature of the problems with which defendant was faced in designing this unique project. The evidence indicates there was at that time only one other test facility of this kind in the United States. But, as previously pointed out, this factor does not justify causing a contractor to suspend important construction activities for significant periods of time while defendant, after many months, still continues to attempt to work out the details of the final project design, which are normally determined before bids are invited on the project.[14]
THE MECHANICAL WORK
The mechanical work for this project was extensive. It required the installation of various systems for the servicing of the project buildings, as well as the mechanical work required to connect the equipment installed by defendant. The systems included (1) a combustion air system, consisting of 54-inch pipe which conducted air from the blowers through the rigs to the Test Wing; (2) an exhaust gas system, consisting of piping ten feet in diameter, which conducted the gas exhausted from the Test Wing through large coolers to the Exhauster Wing (built under another contract) ; (3) a glycol system, consisting of piping which circulated a cooling liquid from the Test Wing to the gas coolers (the air exhausted from the Test Wing had a temperature as high as 3,500 degrees, and had to be cooled, through three gas coolers, before it could be discharged into the at *415 mosphere); (4) a cooling water tower system, consisting of a reservoir from which, cool water was pumped through the Pumphouses to the various buildings; (5) a closed circuit system, consisting of piping which circulated water underground between the Pumphouses, the gas coolers, and the water tower (picking up heat from the exhaust gases, cooling the water, and redistributing it at lower temperatures); (6) a compressed air system, which first compressed and then distributed the air to various points; (7) a steam system, consisting of steam brought from a steam plant to the Brine Pumphouses and then distributed to the Blower and Test Wings; and (8) a storm sewer system, a sanitary sewer system (including the plumbing installations for all the buildings) , and a fire protection system. Portions of these systems were underground, while other portions were supported on outside pipe supports constructed by plaintiff.
A subcontract for all of these systems was let by plaintiff to the Arthur E. Magher Company, Inc., for $3,202,000, which was approximately half of plaintiff’s original total contract price of $6,580,000. Plaintiff’s original progress schedule provided for the performance of the mechanical work in about a year, i.e., from July 1,1951 to June 20, 1952, the work to go on contemporaneously with the construction of the buildings. As it turned out, however, Magher did not begin the installation of the major mechanical piping systems until the spring of 1953, after the completion of the shells of the buildings, which here occurred at the end of February 1953. As hereinabove mentioned, a manpower shortage was an important factor contributing to its late start.

The Improper Elevations on the O and D Bigs

On January 30, 1953, defendant advised plaintiff that the installation of the C and D rigs by defendant had been completed and that plaintiff could now proceed to take the necessary steps looking toward connecting the rigs to the combustion air piping. Thereupon plaintiff promptly made the measurements necessary to enable it to have the required connecting pipe fabricated. Such pipe had to be fabricated to close tolerances and installed at exact elevations.
*416 The connecting pipe was ready to be installed on April 8, 1953, and on that date plaintiff requested assurance that the rigs had been tested and accepted by defendant so that plaintiff could now perform the connecting operation. By letter of April 14, 1953, defendant gave such assurance. Thereupon, in attempting to make the connections, plaintiff discovered that one of the C rigs and two of the D rigs had not been installed at the required, planned, elevation, and so advised defendant by letter of May 6, 1953. This error served to halt plaintiff’s installation of the connecting piping, as well as the installation of an important segment of the combustion air piping north of the rigs.
By letter of June 4, 1953, defendant advised plaintiff that it had secured the performance of the necessary corrective work on the rig elevations, and plaintiff thereupon returned to resume the connection work. However, it then ascertained that the two D rigs were still set at improper elevations, and so advised defendant on June 11,1953. In the intervals during which defendant was performing its corrective work, plaintiff could perform no connection work on these rigs or installation work on the combustion air piping associated therewith.
On July 1, 1953, all of the corrections were finally made by defendant, enabling plaintiff to proceed with the corrections and the piping work north of the rigs, which similarly had to be installed at the proper elevations.
As a result of the incorrect elevations at which the government-furnished equipment was installed by defendant, plaintiff’s work on the connections, as well as on the part of the combustion air system sequential thereto, was delayed at least from May 6 to July 1, 1953, a period of 56 days. This delay, attributable to defendant’s errors, was clearly defendant’s responsibility.[15]

*417
The Installation of the Blower ~Wing Motors

The three 6,000-horsepower motors in the Blower Wing, which were government-furnished equipment, were to be installed by plaintiff. They were to be connected to the combustion air system, and their installation was to be made in conjunction with plaintiff’s work on such system.
After plaintiff had placed the motors on their foundations, it was discovered, on February 12,1953, that the motors were defective in that the coils had been damaged by moisture. The motors had not been adequately protected by defendant while they had been stored. Consequently, it was necessary for defendant to repair them before plaintiff could proceed with its installation work. Defendant did not complete the repairs until March 6,1953.
When plaintiff resumed its installation work on March 6, 1953, it found that the support frames were inadequate to support the motors. These frames had been designed and furnished by defendant. Accordingly, the frames had to be extensively reinforced by defendant. This resrdted in a further delay in the installation work to April 2,1953.
This installation delay, first from February 12, 1953 to March 6,1953, and then from March 6,1953 to April 2,1953, both delays aggregating fifty days, was clearly defendant’s responsibility. The first was due to defendant’s furnishing defective equipment, and the second was attributable to defendant’s deficient frame design. These delays correspondingly delayed the completion of the combustion air system.

The Stop Order on the Combustion Air System

On May 12, 1953 plaintiff was in the process of installing the piping for the combustion air system. On that day, defendant, by letter, ordered plaintiff to stop its work on the part of the piping north of the C rig adjacent to the Prop Cell ( as well as the associated recirculating air piping in the same area). This stop order affected around sixty feet of combustion air piping, five feet in diameter — a substantial portion of such system which plaintiff was then installing. The letter stated that it was necessary to delay the portion of the mechanical work involved for approximately three weeks.
*418 At that time, defendant’s C rig contractor, Mehring & Hanson, was working in the area in question, being engaged in insulating the rig. Defendant stopped plaintiff’s above-mentioned work because the simultaneous operations of each contractor in the area would have constituted an interference with the other. Mehring & Hanson had already placed scaffolding and protective tarpaulins around the rig, all of which would have constituted obstacles to plaintiff’s mechanical work. Defendant decided to let Mehring & Hanson continue with and complete its insulation operations on the rig before giving plaintiff access to the area for the continuation of its mechanical work.
The delay to plaintiff’s operations turned out to be considerably longer than the three weeks indicated in the stop order. It lasted until July 27,1953 — 11 weeks — at which time plaintiff received a letter from defendant which advised that “the installation of the combustion air piping may be resumed.”
As noted, defendant early recognized its obligation to coordinate the activities of its various contractors so that the operations of one would not constitute a significant obstacle to the operations of another. For this reason, it will be recalled, defendant would not permit the installation of the rigs at a time when their presence would block plaintiff’s operations on the Test Wing. In this instance, however, defendant failed in exercising this responsibility. When defendant decided to prosecute the work on this limited-area project through numerous contractors, it must have known that, if it was going to prevent conflicts and resulting delays in their operations, it would be necessary for it to schedule their operations carefully. Cf. Baddwin-Lima-Hamilton Corp. v. United States, 193 Ct. Cl. 556, 434 F. 2d 1371 (1970). Indeed, as previously mentioned, since under plaintiff’s contract the rig was government-furnished equipment, it is defendant itself which is to be considered as performing the rig operations, even though defendant chose to operate through a third-party contractor. Cf. Diamond v. United States, 98 Ct. Cl. 543, 551 (1943). In any event, defendant’s inability to coordinate the work of its various contractors in such a manner *419 as not to cause interferences and substantial delay to their operations resulted in plaintiff’s here being ordered by defendant to stop work on a substantial portion of the combustion air piping system for 77 days — from May 12 through July 27, 1953 — which delay caused a corresponding delay in the completion of the system. Defendant has offered no explanation or justification for its inability to avoid this conflict. This action by defendant again constituted a breach of the implied condition of every construction contract that neither party will so conduct itself as to hinder or delay the performance of the other.

The /Stop Orders on the Closed Circuit System

In early June 1953 plaintiff was working on the closed circuit water system. On June 2,1953 it was, as part of such operation, in the process of excavating for a pump pit and a supporting cradle for a storage tank located north of the Jet Cell. On that day, however, defendant issued a stop order directing plaintiff to halt its operations on such work. The letter explained that the order was necessary “to provide access to erect the structural steel trusses, under another contract * * In accordance with the directive, plaintiff ceased such operations. The order was lifted by a letter received by plaintiff on June 23, 1953. Thus, the order was in effect 22 days. Plaintiff thereupon remobilized its equipment and men and resumed the work.
In August 1953 plaintiff was still engaged in working on this system. On August 12, 1953 defendant issued another stop order directing plaintiff to delay the installation of the tank and the underground services “until further notice.” The letter stated that the stop order action was necessary “to provide access to install a 1,000 gallon tank and oil separator under another contract * * By letter, received by plaintiff on September 1, 1953, the stop order was lifted. Thus, this order was in effect 21 days.
The halting of plaintiff’s work on this system by the two stop orders, in order to allow work on other contracts to proceed, delayed plaintiff’s mechanical work by a total of at least 43 days. Defendant is responsible for this delay for the reasons hereinabove mentioned in the discussion of the im *420 mediately preceding claim relating to the stop order on the combustion air system.
THU DELAY DAMAGES
The claims hereinabove set forth produce a total of 726 days of actionable delay for which defendant is responsible. The damages for the lengthening of the project operations to such extent total $216,574.53, composed of the following:
Additional salaries of supervisory and field
overhead labor_$65, 841. 67
Other increased field overhead expenses (heating of field office, electricity, stationery, etc.)_ 16, 925. 96
Additional expenses for expendable small tools___ 1, 865.09
Additional employee lost time pay (due to holidays and weather)_ 5, 916. 90
Additional wages of truck drivers for extended miscellaneous trucking_ 5,120.48
Additional equipment ownership expense— [16] 23,719.47 Additional general 'home office expenses_ 95, 040.66
214,430. 23
Additional 1% bond premium_ 2,144. 30
216,574. 53
The individual items making up each of the above-specified categories, and the details of the computations with respect thereto, are set forth in the findings, which also indicate the items claimed but not allowed, principally because of insufficiency of proof.[17]
CHANGE ORDER N
The taking of testimony in this case commenced on February 4, 1963. In the midst thereof, the Supreme Court, on June 3, 1963, handed down its decision in United States v. Carlo Bianchi & Co., 373 U.S. 709.
*421 At the beginning of the trial session on June 19,1963, and after more than 7,000 pages of testimony had been heard, including testimony concerning Change Order N, defendant moved that all proceedings in this court be suspended (except those dealing with defendant’s plea in fraud) pending a determination by the Armed Services Board of Contract Appeals (ASBCA) of all of plaintiff’s claims. Since the Board had considered and determined plaintiff’s Change Order N claim on the merits (ASBCA No. 3178), plaintiff did not object to defendant’s motion insofar as it related to such claim and agreed that the court’s review of the Board decision concerning such claim, to be made under the Wunderlich Act (68 Stat. 81 (1954), 41 U.S.C. §§321-22 (1964)), should be based only upon the administrative record.[18]
Accordingly, no findings of fact are made with respect to this claim, the necessary facts being set forth in this portion of the opinion. In this connection, because of the way in which the Board disposed of the claim, it did not recite in its opinion any of the facts out of which the claim evolved. The Board simply held that, as a matter of the proper interpretation of the changes provision contained in the contract, the theory upon which plaintiff’s appeal had been based was erroneous, and that plaintiff had therefore failed to show that it was entitled to any amount in addition to that which the contracting officer had allowed. To make the issue more understandable, however, the pertinent undisputed or indisputable background facts giving rise to the dispute are here set forth.[19]
*422 Defendant desired certain changes in the supports for the outside piping, the characterized valves, and a gas cooler, all located north of the Test Wing. These changes included increasing the height of the gas cooler supports from between one to two feet above the ground elevation, as shown on the original plans, to as high as 11 feet.[20] All of the proposed changes to these piping, valve, and cooler supports were set forth in a “proposal” referred to as Navy Proposal No. 14.
Defendant also desired certain changes in the concrete foundations upon which certain equipment was to rest in the Brine Pumphouses, as well as changes in the equipment and pipe support bases on the roofs of these buildings. All of these proposed changes were set forth in a “proposal” referred to as Navy Proposal No. 18.[21]
Article 10 of this contract, entitled “Changes and Extras,” provided that where a proposed change exceeded $10,000, the contracting officer would convene an advisory board of three members, consisting of two Government representatives appointed by the contracting officer and one representative appointed by the contractor, which board would estimate and report to the contracting officer “the amount of the change in cost, time, or both, resulting from the ordered change.” The article also provided that “In making such estimate, the estimated cost of additions shall be based upon the estimated actual cost to the Contractor and the estimated cost of deductions shall be based upon the estimated cost to the Contractor as of the time the contract was made.”[22]
Pursuant to this contract provision, a Board on Changes was appointed to estimate changes under the contract exceeding $10,000, and this board met on April 21,1953 to consider Proposal Nos. 14 and 18. The board was unable to reach unanimous agreement. On July 9,1953, a majority report was *423 issued by the two Navy members.[23] The contractor’s representative, Eyre, dissented. The majority’s estimate of the additional cost of the changes was $23,300, while Eyre’s estimate was $57,161.30.[24] This large difference of $33,861.30 was attributable to a basic dispute as to the method to be used in calculating the cost effects of the changes. The Government’s representatives felt that plaintiff should be paid such amount as would represent expenditures (in labor, material, and overhead) over and above the amount plaintiff would have been required to expend in accomplishing the work had there been no changes. This amount was described in their report as “net quantities of work in excess of that required in performing the basic contract work.” They explained that “Since the scope of the work involved in each case remains essentially the same, it is maintained that, in the absence of a breach of contract, the Government is not liable for any increased costs incurred by the contractor on the basic contract work.”
On August 4,1953 Eyre issued his minority report.[25] This report reduced plaintiff’s estimate to $51,442. There was substantial agreement between the parties as to both the quantities and the unit prices of the work involved in the changes. However, as Eyre put it, “The Board was unable to agree * * * on the method of submission of the proposals which makes the big difference.” As to the outside pipe supports, plaintiff claimed that, due to defendant’s actions, the work involved was delayed eight months, “and by that time conditions under which the Contractor had to work were considerably changed at the site as the area on which the work was to be performed had been very much confined by the other structures and installations that had been installed in the meantime. Wages had increased and access to the site had been considerably obstructed — whereas, when we originally planned to do this portion of the work there were no obstructions.” As to the Brine Pumphouse roofs, Eyre recounted (as hereinabove set forth in the “delays” portion of this opinion) the delay in *424 plaintiff’s operations which, had occurred commencing in early March 1952, including the stoppage of plaintiff’s work. He also stated, with respect to the revisions:
We feel that this was a complete redesign of this portion of the work — essentially, the original work had been deleted and we were given the new design to work with on which we had not originally bid. Also in view of the fact that they did not allow us to proceed with the original contract work in accordance with our original schedule on which we bid.[26] We feel that our method of submission in connection with this proposal is fair, and in strict accordance with our contract 'by not being able to do this portion of the work at the time we had planned, and conditions were created due to other installations that increased our costs enormously.
To effectuate his theory, Eyre based his estimate on the higher current costs of performing all of the work to be done in constructing all of the outside supports (in the area in question) and all of the work to be done in constructing the entire roofs of the Brine Pumphouses, not only the work involved in the changes. Plaintiff was, however, willing to give defendant a credit in the amount of what it estimated it would have cost it to have constructed all of the supports (in the area) and the roofs had there been no changes, had defendant not delayed it, and had defendant permitted plaintiff to adhere to its original schedule of operations.
The majority report’s description of Eyre’s method was “that the price adjustment should be arrived at by crediting the Government with his original estimate for the work in its entirety, and deducting this sum from the estimated cost of the new work in its entirety, based upon current prices.” Although defendant disagreed with plaintiff’s method of calculating the changes involved, and although under defendant’s method no calculation (in any significant amount) of any part of the original cost of the work was necessary (since there was no substantial reduction in any items of work or quantities caused by the changes, so no significant credits therefor were due defendant), Eyre nevertheless *425 pointed out that the majority members “questioned the low unit costs for the work deleted” (under his method, the entire original outside supports work in the area in question, and the entire Brine Pumphouse roof work constituting the deletions) . However, he defended the unit costs he used for such deletion purpose, stating that he had taken them “from our original estimate sheets made at the time the bid was prepared,” which estimate, he insisted, was “fair and reasonable.”
On July 13, 1954 the contracting officer issued Change Order “N” [27] which increased the contract price by $23,300, thereby adopting the recommendation contained in the majority report.
On August 6, 1954 plaintiff appealed the contracting officer’s decision to the Secretary of the Navy.[28]
In the meantime, plaintiff had submitted large claims for compensation for alleged delays and interferences to its work, as well as for increased amounts on change orders issued and pending. (One of its submissions — a letter of December 11, 1953, and attachments thereto — consisted of 195 pages and claimed, as of such date, over $850,000 for the delays and over $625,000 for increased amounts on change orders.)[29] Plaintiff requested the contracting officer to appoint a special board to consider its claims.
Within the Bureau of Yards and Docks there had been established a 'Contract Award and Review Board consisting of five Bureau members, one of whose functions was to make recommendations to the Chief of the Bureau concerning claims or appeals by contractors.[30] The senior member of the board was Admiral Sihler, and, in accordance with plaintiff’s request, its claims were referred to this board (the “Sihler Board”). However, after a brief meeting on May 11, 1954, the board concluded that plaintiff’s claims were for unliquidated damages and could not be paid under the contract.
As a result of plaintiff’s protest concerning this action of the Sihler Board, and plaintiff’s request that another board *426 be appointed to 'bear its claims, the Chief of the Bureau, on August 9, 1954, appointed a special board to consider such claims and to make recommendations to him with respect thereto. This board also consisted of five Bureau members, the senior member being Captain Randig (the “Randig Board”). The board held several meetings between August 17 and September 10, 1954, and considered all of plaintiff’s claims that had been theretofore made, including plaintiff’s claim for an additional amount under Change Order N. Accordingly, the processing of plaintiff’s appeal of August 6, 1954 with respect to Change Order N was (apparently by agreement) suspended pending the receipt by the contracting officer of a report from the Randig Board and his reconsideration of plaintiff’s claims. The claims for additional change order compensation, totaling $628,584.76, were recapitulated and submitted to the Randig Board on September 3, 1954.[31]
During the course of its deliberations, the Randig Board requested the Resident Officer in Charge of Construction (ROICC) to prepare for its information a cost estimate of the work done under Navy Proposals 14 and 18 on the basis of the theory of computation of the minority report of the Board on Changes, but, in connection therewith, to use, as the estimated prices which the contractor would have had to pay for the original work, prices which the ROICC considered to be reasonable (as against the prices in plaintiff’s bid estimate, which Eyre had used). The ROICC made such a computation and submitted it to the board. The computation indicated that, on the described bases plaintiff would receive, with respect to Proposal No. 14, an increase in direct labor of $9,166 and in direct material of $7,142, making a total increase of $16,308. With respect to Proposal No. 18, plaintiff would receive an increase of $5,010 in direct labor and $2,800 in direct material, making a total increase of $7,810. For both proposals, the increase (in Change Order N) would total $24,118.[32]
By its report of October 21, 1954, the Randig Board recommended to the contracting officer that plaintiff be paid *427 the total amount of $175,459 as additional change order compensation.[33] With, respect to 'Change Order N, this included the sum of only $5,839.[34] The hoard stated that such sum represented amounts (for both proposals) for “additional labor not allowed by the Board on Changes in unilateral Change Order 'N’.” It explained that it “agrees that a portion of the additional labor requested by the contractor on this item should be allowed under the unilateral Change Order N’ but does not concur with the contractor’s estimate * * *” (the board instead relying on the field records of the BOIOC) .[35] The increased amounts were described as “Difference in Labor of Original Design and Bevised Design.” The board stated that the total amount recommended did not include any compensation “solely for delays due to acts of the Government.”[36] In addition, the board, in its “Conclusions,” stated that it concurred “in the contention of the contractor that calculation of the costs of labor and material in the case of changes which are the result of complete redesign of a component pant, properly should have been on the basis of the current cost of the redesigned unit or assembly less the cost of the original design when bid.”[37] And in its “Becommendations,” it recommended “That Article 10 of the contract be amended to provide that when any well defined portion of the contract is completely redesigned, the calculation of the value of the change order for purpose of amendment to the contract be on the following basis: The negotiated estimated cost of the new design calculated on a current basis less the estimated cost of the original design when the contract was bid.”[38] Plaintiff was not furnished a copy of this report or any of the submissions to the board, including the BOICC’s computation.[39]
*428 On November 22,1955, tlie contracting officer issued Ms decision concerning the various claims specified in plaintiffs September 3, 1954 submission to the Eandig Board. Tbe decision allowed $53,249.53 on plaintiff’s change order claims totaling $62S,584.76. Included in the allowances was an additional amount for work done under Proposals 14 and 18. The parties are in disagreement as to how much that allowance was, defendant contending that the amount was $23,335.73 (thereby making a total for the work involved of $46,635.73), whereas plaintiff contends the amount was only $17,530.88 (thereby making such total the sum of $40,830.88).[40] (As will be seen, the ASBCA held that it was *429 not necessary to resolve this dispute.) The parties are now agreed that, although the amounts are different, the estimate that had been prepared by the EOICC for the Eandig Board on the basis of plaintiff’s theory (which estimate the board rejected) was the basis for the allowances made by the contracting officer.[41] It appears plain therefore that, in making his additional allowances, the contracting officer adopted plaintiff’s theory, albeit not plaintiff’s figures (although plaintiff apparently did not know this at the time it received the contracting officer’s decision, the decision itself not explaining the theory or the details upon which the Change Order N additional allowances were made).
On December 12, 1955, plaintiff appealed the contracting officer’s decision of November 22,1955.[42]
By Change Oi’der T, dated January 10,1956,[43] plaintiff was paid the additional amounts allowed by the contracting officer, i.e., $53,249.53.
The presentation of evidence before the ÁSBCA with respect to Change Order N took place on seven days in August 1957. The hearings, including the testimony of the EOICC, made plain that the additional Change Order N amounts allowed by the contracting officer in his second decision had been calculated on the basis of the EOICC’s computations submitted to the Eandig Board, which computations, as shown, were based on plaintiff’s theory. Plaintiff nevertheless contended that, in applying such theory, defendant had used improper quantities and unit prices. Instead of using plaintiff’s bid estimate to calculate the deductive credits, the EOICC had used a formula — current prices less 25 percent— which plaintiff claimed was inaccurate. In addition, there were quantity differences (attributable in part to a contention by plaintiff that one portion of the pipe support work had been entirely omitted by the EOICC). In an effort to resolve these differences, the parties agreed during the course of the hearings to attempt to stipulate out these differences with the understanding that a failure to reach agreement would be followed by further hearings.
*430 The parties were able to reach certain agreements. Their stipulation agreed upon “the additional quantities required in connection with the performance * * * of the work covered by Change Order N,” such quantities being set forth in an attachment to the stipulation. The stipulation further recited, however, that “the parties do not agree in all instances as to the unit prices for labor and materials to be paid for the quantities agreed to * * *” but did, by an attachment, set forth the unit prices which each party contended were applicable, such prices being applied, in each case, to “the agreed quantities.” The stipulation then went on to state that “* * * the amounts due to appellant under Change Order N, if the Board decides that appellant is entitled to payment on the basis of the appellant’s unit prices and the agreed quantities is $15,626.71 * * *,” and “that the amount due to appellant under Change Order N, if the Board decides that appellant is entitled to payment on the basis of the Bureau of Yards and Docks unit prices, and the agreed quantities, is $3,841.61 * * [44] The stipulation was executed by the Bureau on October 8, 1957 and forwarded to plaintiff with a letter of such date which stated that it had executed “your proposed stipulation” with certain “qualifications” which, as to the Change Order N claim, were stated to be as follows: “The Bureau agrees to the stipulated quantities * * * and agrees that the price extensions and calculations of overhead, etc., are mathematically correct. However, the Bureau considers that the individual prices merely represent the claims of the parties, and the Bureau does not agree with the Contractor as to the total amount already paid on Change N.” The letter reiterated defendant’s contention that the disputed sum of $5,804.85 was applicable to Change Order N, and that such application “would leave the Bureau owing the Contractor $9,821.86 if the Contractor’s unit prices are used, and would leave the Contractor owing the Bureau $1,963.24 if the Bureau’s unit prices are used.” [45] The letter *431 was attached to, and made a part of, the stipulation.[46]
On June 27, 1958, the ASBCA handed down its decision on plaintiff’s appeal from the contracting officer’s decision of November 22, 1955.[47] By that part of its decision which was addressed to Change Order N (denominated in the appeal proceeding as Claim No. 14), the Board dismissed plaintiff’s claim in its entirety, holding that, whether plaintiff had been paid $46,635.73 for the work covered by such change order as claimed by defendant, or only $40,830.88 as claimed by plaintiff, plaintiff “has not demonstrated that it is entitled to any amount in excess of” the $40,830.88 which plaintiff concededly had received.[48] Such conclusion, the Board stated,
* * * is based on the insufficiency of the evidence before us. The only pertinent evidence is recapitulated in the form of a stipulation filed with the Board subsequent to the hearing. In this stipulation the parties have agreed on the additive and deductive work quantities for both the changed and the unchanged, work but have applied unit prices for labor and materials in such maimer as to reprice the original unchanged work, i.e., by treating the total of both the unchanged and changed work as the additive items and the unchanged work as the deductive items and then attaching unit prices to such additive and deductive work quantities and accumulating the dollar differences, rather than by applying agreed unit prices simply to net differences in work quantities. We deem this inconsistent with the Changes and Extras article of the contract, which provides that “the estimated cost of additions shall be based upon the estimated actual cost to the Contractor and the estimated cost of deductions shall be based upon the estimated cost to the Contractor as of the time the contract was made.” [49]
The Board further concluded that the stipulation, which it stated did not “settle the method” by which the change *432 order should be computed, was “ineffective to modify the Changes and Extras article of the contract * * and that it was “valueless as evidence either in affirmative support of Appellant’s position or as an admission by the Government.” [50]
The additional compensation which plaintiff seeks in this court on this issue is $15,626.71,[51] the figure set forth in the stipulation as the amount to which plaintiff would be entitled (a) if plaintiff’s basic theory of computation is adopted; (b) if plaintiff’s unit prices are used as applied to the agreed quantities as set forth in the stipulation; and (c) if the disputed amount of $5,804.85 is found as not being properly applicable to Change Order N.
Plaintiff’s claim cannot be sustained. It founders on the first of the above-specified conditions, for it is plain that its basic theory of computation is legally impermissible. While no presumption of correctness attaches to the Board decision since, as a matter of contract interpretation, it involves a question of law, the Board’s conclusion that plaintiff’s theory is “inconsistent” with the Changes and Extras Article of the contract is manifestly correct.
Plaintiff’s claim rests essentially on the repricing, in terms of prices current at the time the change is performed, of the entire segment of the project in which the change was incorporated, including all parts of such segment not changed or affected by the change. In a period of rising labor and materials prices, this would, of course, permit the contractor to escape the burden of such price rises on such unchanged part, as well as the consequences of unduly low bidding or bid mistakes. Under a changes article such as is here involved, the cost of performing unchanged work can be included in the equitable adjustment only if such cost is necessarily directly affected by the performance of the change. If so, those increased costs of performing the unchanged work which are directly attributable to and *433 which flow from the change are properly compensable under the change order. Merritt-Chapman & Scott Corp. v. United States, 192 Ct. Cl. 848, 429 F.2d 431 (1970); Electronic & Missile Facilities, Inc. v. United States, 189 Ct. Cl. 237, 416 F.2d 1345 (1969); Paul Hardeman, Inc. v. United States, 186 Ct. Cl. 743, 406 F. 2d 1357 (1969).
Plaintiff says, however, that in the situation here involved there was in effect no “unchanged” work. It argues that the outside supports in the area in question and the Brine Pump-house roofs were “so redesigned” by Proposals 14 and 18 “as to differ radically from” such “work” as “originally designed, with the result that the changes were inextricably bound up with the original work so that it was impossible to reasonably segregate any substantial portion of the work, and identify it as additional or extra work separate and apart from the original work.”[52] It therefore maintains that its proposed method of computation is proper “inasmuch as the changes that are the subject of this claim did not consist of mere additions of extra work, or deletions of previously required work, but were revisions that affected a redesign of the work inextricably interwoven with the quantities required for the work as originally designed.”[53] Throughout its presentation of this claim, plaintiff constantly refers to the alleged impossibility of isolating the “revised work” from the “original work,” and emphasizes the drastic nature of the changes, which, among other things, affected “the shape and design of the concrete for [the] roofs,”[54] and the shape and dimensions of the supports.[55]
These contentions do not change the result. First, in considering whether the cost of performing unchanged work is affected, the test is not how “radical” the change is. Slight changes in a part of a building segment may have a serious cost effect in performing the work involved in the remaining unchanged parts of the segment, whereas a “radical” change *434 may not have any effect upon such. cost. The test is, as stated, whether, as a matter of fact, the cost of performing the unchanged work is directly affected by the change.[56]
In any event, even if, employing the proper test, plaintiff were correct in its basic point,[57] it would still make no difference because plaintiff’s theory of computation is also improper even if applied only to work deemed to be actually changed.[58] For instance, where the shape of a concrete mass *435 is “drastically” changed, but, nevertheless, only one more cubic yard of concrete is required for the entire work as changed, the contractor would obviously be entitled to payment for the additional yard at the price current at the time of the performance of the change. The one cubic yard addition is computed by calculating the mass of the changed structure and subtracting therefrom the mass of the structure as originally designed. Plaintiff would under its formula apply to the subtracted, original mass its bid estimate unit prices, which, in the instances here prevailing, were lower than the prices current at the time of performing the changes. This would result in compensating it in a much larger figure than the current price of one cubic yard. Thus, as in nonchanged work, plaintiff would be able to pick up all of the price increases that had occurred between the time of the bid and the time of performing the change. Plainly, this is the type of consequential added cost for which United States v. Rice, 317 U.S. 61 (1942), forbids reimbursement under a change order. An equitable adjustment cannot be the mechanism for correcting unduly low bid estimate figures. S. N. Nielsen Co. v. United States, 141 Ct. Cl. 793 (1958). The equitable adjustment allowable as a result of a change is the difference between what it would cost the contractor to do the work and what the cost would have been if the change had not been ordered. Paul Hardeman, Inc. v. United States, supra, id. at 752, 406 F.2d at 1362-63; Kaiser Industries corp. v. United States, 169 Ct. Cl. 310, 336, 340 F.2d 322, 337 (1965). In the instance described above, the only way to calculate such “difference” would be at the price of concrete prevailing at the time of the change. Had there been no change, plaintiff would have been obliged to purchase its materials at the prices current at the time of such performance. Therefore, the difference between such price and its lower bid price is not at all due to the change, and it would, consequently, be improper to include it in the equitable adjustment.
Plaintiff’s calculation of such “difference” by using its originally estimated prices as the subtraction factor is based upon the provision in Article 10 that “the estimated *436 cost of additions shall be based upon the estimated actual cost to the Contractor and the estimated cost of deductions shall be based upon the estimated cost to the Contractor as of the time the contract was made.” But it is plain that “the estimated cost of deductions” provision has no relationship to the subtraction factor employed to determine the net amount of the increase. The “deduction” reference obviously applies to the situation where the change effects a reduction in or elimination of contract work in contrast to the situation where there are “additions.” The provision is composed of two entirely separate clauses, one referring to “additions” and one to “deductions.” Proposals 14 and 18 were obviously concerned with “additions,” i.en increasing the height of the supports, and increasing the thickness of the concrete bases to support the equipment on the Brine Pumphouse roofs. The ASBCA was correct in rejecting plaintiff’s construction of Article 10, as was the Eandig Board in concluding that the application of plaintiff’s theory would require an amendment of such article.
In this connection, the pitching of plaintiff’s case for a repricing of all the supports and roof work in question solely upon the alleged radical “redesign” thereof “as a result of which nothing of the original work remained” [59] represents a definite shift in emphasis. As shown, plaintiff’s computation theory evolved from Eyre’s minority Board on Changes report. And, as seen, while Eyre did mention therein the “complete redesign of this portion of the work,” his claim for higher prices on such “work” was based principally upon the delays allegedly caused by defendant, which, he complained, required plaintiff to perform the supports and roof work under conditions different from those which would have existed had there been no delays. As to the supports, Eyre referred to defendant’s delaying the work eight months, by which time the conditions under which plaintiff had to work had “considerably changed at the site * * the area in question being by then “very much confined by the other structures and installations that had been installed in the *437 meantime.” He further relied on the fact that “wages had increased.” As to the roofs, he also emphasized the delays to plaintiff’s operations (for which compensation is separately provided herein) and, further, generally referred to defendant’s having prevented plaintiff from proceeding “with the original contract work in accordance with our original schedule on which we bid.” Clearly, these are the types of' delay damages not recoverable as part of an equitable adjustment made under a changes provisions of the kind here involved. United States v. Rice, supra. For all proved actionable delays, plaintiff is here being otherwise compensated. The Board on Changes, in also rejecting plaintiff’s theory of computation, -was correct in stating that “* * * in the absence of a breach of contract, the Government is not liable for any increased costs incurred by the contractor on the basic contract work.”
Finally, plaintiff argues that the ASBCA acted arbitrarily because it decided the appeal on a basis different from that urged by either party. Plaintiff says that the contracting officer, after the receipt of the Bandig Board report endorsing plaintiff’s theory, obviously agreed that such basis of computation was proper since, by his second decision, he paid it over $17,500 additional computed on such theory (as the ASBCA hearings brought out), and that the Bureau, in the proceedings before the ASBCA, also agreed that plaintiff’s theory was proper, differing only as to the unit prices for the deductive work quantities. Plaintiff points to the stipulation into Avhich the Bureau entered computing the different amounts of recovery based solely on plaintiff’s theory. And plaintiff further points out that the Bureau did not seek a return of the amount paid out by the contracting officer in his second decision giving plaintiff the additional amount.
These contentions, too, cannot be accepted.
Plaintiff’s reliance upon the Bandig Board’s report is misplaced. As hereinabove noted, although the board did feel there was merit in the contractor’s method of computation “when any well defined portion of the contract is completely redesigned,” it nevertheless concluded that the Changes and Extras Article would have to be amended before such method *438 could be employed. It rejected the ROICC’s computation of over $24,000 based on plaintiff’s method, and instead recommended to the contracting officer an increase of only some $5,800 for additional labor, necessarily computed, because of its interpretation of Avhat was allowable under such article, on the same basis as the original Change Order N allowance. It was the contracting officer who rejected the board’s recommendation and instead allowed a larger sum based on the ROICC’s computation (although not in the same amount as recommended by the ROICC).
Plaintiff’s contention concerning the position of the Bureau before the ASBCA has more substance. The Bureau apparently decided not to espouse the figure originally adopted by the contracting officer in Change Order N. Bureau counsel stated at the hearing: “We have abandoned this calculation,” [60] and subsequently the Bureau stipulated with plaintiff as to what, under plaintiff’s theory of calculation, the amount of recovery would be under differing unit prices. Plaintiff argues that all of this, including the Bureau’s failure to seek the return of the amount calculated on plaintiff’s theory and paid out by the contracting officer’s second decision, demonstrates that the Bureau agreed that plaintiff’s theory was the correct one.
That the Bureau did, as plaintiff states, decide not to urge the correctness of the first allowance by the contracting officer, is plain. Why the Bureau decided to do this is not clear. Vis-a-vis its position with respect to the contracting officer, the Bureau was in the unenviable situation of such officer’s having used one theory of computation on his first allowance — that recommended by the majority report of the Board on Changes — and a different theory on his second allowance— that recommended by the minority report of such board.
However, was plaintiff justified in concluding that the Bureau was conceding the propriety of plaintiff’s theory simply because the Bureau abandoned the first calculation, did not seek the return of the second payment made on plaintiff’s theory, and then stipulated as to alternative *439 amounts of recovery if plaintiff’s theory were adopted? Such a conclusion would constitute quite a leap. It was plaintiff that Avas appealing and it was therefore plaintiff’s burden to establish that it Avas legally and factually entitled to more than it had received from the sum total of the tAvo decisions of the contracting officer. The fact that the Bureau was “abandoning” the contracting officer’s first calculation (as did the Bandig Board) did not necessarily mean it was agreeing that either plaintiff’s theory or the contracting officer’s second calculation theory was correct. Nor did the fact that it stipulated as to various amounts of recovery if plaintiff’s theory were adopted — a common type of stipulation — mean it was agreeing with such theory. And the fact that the Bureau did not seek the return of the amount that had been paid on plaintiff’s theory could be based on a variety of considerations.[61]
In any event, if plaintiff thought that the above-described incidents indicated that the Bureau was agreeing with plaintiff as to the propriety of plaintiff’s theory, it certainly must have been disabused of that notion when the Bureau, after the stipulation Avas entered into and the hearings thereupon closed, submitted its brief to the ASBCA sharply attacking plaintiff’s theory and urging the Board not to accept it.[62] Among other things, the Bureau argued, with respect to plaintiff’s theory, that “This new method of computation- — -deducting the price of the original Avork in its entirety from the price of the revised work in its entirety, the revised AA'ork being figured at higher unit prices — results in the Contractor immediately receiving a price increase even on unchanged work.”[63] And it further pointed out that the contractor at the hearings justified its method on the ground that the Avork in question “was delayed by changes from the beginning of the job to later in the job when wage and material costs were higher and other *440 structures interfered with the work” (the same justification as was set forth in the minority report of the Board on Changes), and that, under the cases, such claims for delays and interferences were “not compensable by the Contracting Officer and this Board.” [64] Surely, plaintiff can hardly be heard to say that both parties before the Board were of one mind and that the Board was therefore arbitrary in not accepting their alleged agreed-upon theory.
Furthermore, even had the parties agreed upon the propriety of the use of plaintiff’s theory, the Board would not be obligated to accept such agreement or to be bound by it if it concluded that the theory was legally improper. A Government board of contract appeals is “not precluded from deciding a claim on a theory not advanced by the parties.” L. B. Samford, Inc. v. United States, 187 Ct. Cl. 714, 724, 410 F. 2d 782, 787 (1969) (it was not improper for the board to decide a changed condition dispute on a theory not presented either to the contracting officer or to the board).
The Board here found that plaintiff had failed to show that the amount paid to it under Change Order N and Change Order T giving plaintiff an additional amount for the work performed under Change Order N — even accepting plaintiff’s contention that such amount was $40,830.88, as claimed by it, and not $46,635.75 as claimed by defendant— was, under a proper interpretation of the Changes and Extras Article, insufficient. Since the only evidence for increased compensation which plaintiff presented to the Board was based on an improper legal theory, the Board’s decision is manifestly correct. Accordingly, plaintiff is not entitled to recover on this claim.
THE ERATO) PLEA
A fraud plea of the type here involved must be sustained by “clear and convincing” proof that the claimant has, in the language of the statute hereinabove set forth,[65] “cor *441 ruptly” practiced or attempted to practice “fraud against the United States in the proof, statement, establishment, or allowance” of “a claim lagainst the United States.” In these cases”* * * defendant has the burden to prove by” such evidence “that plaintiff knew the claims in question * * * were false, fictitious, or fraudulent.” Eastern School v. United States, 180 Ct. Cl. 676, 694, 381 F. 2d 421, 432 (1967), and cases cited therein. As was long ago held by this court in New York Market Gardeners’ Ass’n v. United States, 43 Ct. Cl. 114 (1908), after pointing out the harshness of the forfeiture penalty imposed by the statute, the “burden of proof rests upon defendant to make good the charge, and the circumstances ought to be so clear and convincing that the mind can rest with safety upon the result.” (at 138). The court concluded that, upon reviewing the record, it “has not been able to bring itself to the belief that this [fraud] charge has been made out.” Id.
In this case too, the conclusion is compelled that defendant has failed to meet the evidentiary burden cast upon it for the sustaining of the charge.
The fraud plea rests upon the inclusion of 'amounts in plaintiff’s damage schedules presented to the court based upon 510 specified entries contained in the corporation’s books and records and the inferences defendant contends must necessarily be drawn therefrom. These book entries, defendant insists, in and of themselves make plain that expenditures which were in fact personal indebtednesses of the corporation’s officers were being charged as alleged legitimate direct or allocable corporate expenses of performing the contract which is the subject of this suit. Such entries also make evident, defendant contends, that there were similarly charged as such alleged legitimate contract expenses, and therefore likewise included in such damage schedules, payments which were in fact nothing more than reimbursements to certain officers and employees of the corporation of the federal and state tax withholdings that the corporation had made on their salaries.
The basic difficulty with defendant’s case is that it rests almost entirely on the cold book entries themselves. No *442 officer, bookkeeper, or accountant who personally had knowledge of or responsibility for the 510 specific entries upon which the fraud plea rests testified. This void has apparently produced a lack of precision as to who defendant claims was guilty of committing the fraud which it seeks to pin on the corporation for the purpose of effecting a forfeiture of its claim. Perhaps defendant’s difficulty is understandable in view of the bankruptcy proceedings and the interests of the corporation passing into new hands prior to the presentation of its claim to the court. Since John Cronin was the operating head of the company when it was last functioning, defendant’s finger of suspicion points primarily to him as the architect of an alleged scheme to unload on the corporation his personal debts, as well as those of other members of the Cronin family. But, as stated, John Cronin did not testify, nor did the bookkeeper who allegedly made the book entries on John Cronin’s direction, and it is plain that the true nature of the expenditures upon which defendant relies actually rests upon conjecture, and not upon compelled inference.
Almost all of the 510 items specified in the fraud plea were the subject of extended testimony by defendant’s auditors and by Eyre. For the most part, however, all of these witnesses were in effect speculating as to whether the entries did or did not represent legitimate corporation expenses for the performance of the contract. Defendant’s auditors frequently conceded that it was possible for expenditures of the type represented by the challenged entries to constitute proper corporation expenses. Apparently reassessing its position upon a study of Eyre’s testimony concerning the items and the supporting records with respect thereto, defendant now relies on only 179 of the 510 items specified in its plea.
It should be pointed out that there is no real dispute concerning the fact that the corporation’s books did contain entries representing payments for some personal indebted-nesses of the officers. Eyre admitted that, in compiling the schedules, he came across certain entries which he eliminated from the claim because he too concluded they represented personal, not corporate, indebtednesses. This was a family corporation and the payment of personal bills of Daniel and *443 John Cronin was sometimes made by the corporation, the amounts to be later reimbursed by the individuals. The books reflected special accounts, designated as “officers’ loan accounts,” showing their personal indebtedness to the corporation, but Eyre, feeling that some entries very probably should have been included in such accounts but that somehow, as a bookkeeping matter, failed to be incorporated therein, eliminated them anyway. He was handicapped because he was working with the books of a defunct corporation. Thus, assuming that defendant’s complaint is not based on the keeping of false books and records as an abstract proposition, but instead is based on the actual presentation of items therein in the claim against the Government, defendant is in essence simply claiming that Eyre did not eliminate enough.
The specific corporate book entries upon which defendant now relies as in fact constituting personal expenditures of the Cronins are all detailed in the findings, together with Eyre’s interpretation, based on his knowledge of company operations and policies, of what they represented and why he included them in the claim. There is no need to repeat them here. The following examples, however, are illustrative and demonstrate the weakness of defendant’s case based simply on the entries themselves.
Defendant points to certain items representing payments to restaurants and clubs. But the testimony shows that John Cronin at times entertained business associates, both in connection with the corporation’s business generally and with the specific contract here in suit.[66] Reasonable expenses of this type could certainly constitute legitimate corporation expenditures.
Also included is an item, of which much is made by defendant, representing the payment by the corporation of a fine and costs imposed on John Cronin for speeding, but Eyre testified to a company policy of reimbursing all employees for traffic and similar fines incurred in the performance of their official duties. The assumption of such an indebtedness by the corporation might not constitute a proper item of damage in a suit of the kind here involved, but it could hardly be char *444 acterized as the keeping of false books and records, or, because of its inclusion in the damage claim, as the making of a false claim against defendant.
A number of expenses to which defendant takes exception consist of payments by the corporation of various bills with respect to automobiles personally owned by the officers. The proof is, however, that such automobiles were used in part on corporation business. Certainly, reimbursement by a business for expenses so incurred for its benefit would be proper. While Eyre had no specific knowledge of the particular bills in question, where the corporation’s books charged the item as a corporate expense, he assumed it had been incurred in connection with the use of the car on company business.
Similarly, some items which defendant attacks represent payments for telephone bills made from Cronin family residences, such as from the residence of Daniel Cronin’s daughter. Her home was close to the residences of her father and her brother John. Although again Eyre knew nothing of the individual bills challenged, he was familiar with the fact that many business telephone calls had been placed by the Cronin officers (as well as by Eyre himself) from their homes and the homes of their families. Corporations should, of course, pay for their own business calls even if placed from private telephones.
Included in the challenged items are three payments (totaling $160) by the corporation for medical treatment for John Cronin. Eyre included these because, pursuant to a duly adopted resolution of its board of directors, the corporation had purchased a $350,000 insurance policy on the life of this principal, managerial officer, the corporation being designated as the sole beneficiary. Eyre felt that, as the head of the company whose life the corporation had so insured, it would be reasonable for the corporation to assume his medical treatment charges, in reasonable amounts, and the fact that such charges did appear on the books as corporate expenses indicated such an assumption. The assumption of such bills by a corporation under such circumstances (assuming there had in fact been such an assumption) would hardly be ultra vires, let alone fraud.
*445 Two large checks cashed by John Cronin’s wife in Florida are challenged, but Eyre included them because he knew that John Cronin and a group from the corporation had traveled to Haiti at that time in an attempt to obtain a large housing contract from the Government of Haiti. The expenses of such trip were charged on the corporation’s books to home office overhead, as were the two entries here questioned, and Eyre assumed these too were also part of such expenses. Certainly traveling expenses incurred in an attempt to obtain new business (if in fact that was what these expenditures represented) are legitimate corporate expenditures.
Other challenged overhead items are for gifts made about the time of the Christmas season. These were included by Eyre on the assumption they represented Christmas remembrances to persons he assumed were business associates or employees, again in line with what he knew company policy to have been.
A large number of items involving certain expenses relating to private residences of members of the Cronin family, such as taxes, insurance, light and heat, as well as expenditures for the maintenance of such residences and their contents, are included in the claim and in the fraud plea, and are the subject of sharp controversy. The evidence shows that shortly after plaintiff received the instant contract, it commenced negotiations for a bank loan to finance the contract operations. Such a loan, in the amount of $300,000, was made on August 13,1951. Included in the security for the loan were the proceeds of the contract, the individual guarantees of Daniel and John Cronin, and first mortgage liens on eleven pieces of real estate owned by them and their wives. As time went on, the corporation required additional funds to finance not only such contract but others which the corporation had, and in 1954 the loan was doubled, with further security given, including certain realty owned by the corporation. Two supplemental loans made in 1955 brought the amount up to $800,000.
In compiling the damage schedules, Eyre came across the aforementioned payments by the corporation relating to such private residences and noted that these were the premises that *446 had been mortgaged to the bank for the benefit of the corporation. The bills in question did not include all bills of such types during the years involved. Eyre recognized that debts of these kinds would ordinarily be considered as personal expenses relating to privately owned residences. Here, however, a substantial part of such expenses had been paid by the corporation, had not been charged to the officers’ loan accounts, and were entered on the corporate accounts as corporation indebtednesses. Although he found no evidence of any written agreement by the corporation to assume such expenses in consideration of the mortgaging of the properties for the benefit of the corporation, Eyre concluded, because of the payment pattern indicated, that an informal agreement or understanding to such effect must have been the basis for the payment of such a large number of such debts by the corporation. He did not consider the lack of formalism concerning such an agreement between this family corporation and its three stockholders to be surprising. Strengthening his belief concerning the existence of such an agreement or understanding was his conclusion that under the circumstances it would be proper for the corporation to bear an appropriate portion of the expense of the ownership, operation, or maintenance of private properties that had been mortgaged for the corporation’s benefit.
Again, without deciding the propriety, from a damage point of view, of including corporation payments of these kinds in a claim such as is here involved were there in fact such an agreement or understanding by the corporation such as Eyre assumed existed, it could nevertheless hardly be said that such payments could not be considered as corporation obligations duly supported by consideration. (All of the mortgaged properties were ultimately lost to their owners by foreclosure in order to pay the corporation’s debts.) Under such circumstances, their inclusion in the corporation’s claim could not fairly be considered as constituting a fraudulent attempt to include the personal indebtednesses of the Cronins under the guise of corporate expenses.
Defendant’s contention concerning alleged reimbursement of federal and state tax salary withholdings under the guise of legitimate corporate expenses rests on a group of book entries relating to one Dennis Cronin. These consti *447 tuted a series of weekly payments made to him by plaintiff from June 7, 1951 to August 27, 1953. With few exceptions the payments were in the amount of $9.07, $9.08, $9.87, $9.88, or $9.73. The payments, totaling $858.55, were all evidenced by petty cash slips indicating that they were for travel expenses.
Dennis Cronin was neither an officer nor a stockholder of plaintiff. He was a retired captain of the Newark police force and was employed by plaintiff as a messenger. His duties involved the servicing of the instant project as well as various other construction projects being performed by plaintiff, and included the delivery of money, tools, supplies, drawings, and mail. In performing such duties, he used his privately owned automobile.
In compiling the damage schedules, Eyre noted petty cash slips indicating reimbursement to Dennis Cronin for out-of-pocket expenses for the operation of his automobile, such as for fuel and oil, in addition to the above-mentioned weekly slips. Each of the weekly payments during the aforementioned period was charged on the corporation’s books to the instant contract under the home office overhead category as “Employees’ Travel and Lodging.” Eyre assumed that such weekly payments were for the use of Dennis Cronin’s privately owned automobile on company business and consequently included them in the claim. He knew that other employees of the corporation who consistently used their cars on company business were also paid weekly amounts for such use.
In the course of making their audit, defendant’s auditors discovered that these weekly payments to Dennis Cronin were in the identical amounts of the withholdings that had been made on his weekly salary. When Eyre included these book entries in the claim, he did not know of such equivalence.[67]
Despite the identity of the amounts, plaintiff strongly denies any inference of fraud from these entries. Furthermore, it still insists that they constitute proper items of expense chargeable to the instant contract. Plaintiff points out *448 that Dennis Cronin was entitled to some reasonable payment for the use of his privately owned car on company business, as would anyone else, and that there was no reason why the amount of such compensation could not be measured by the amount of such salary withholdings. There is no indication in plaintiff’s records of any other payment to him for such use. It argues that the amounts involved, totaling around $860 over a two-year period, are reasonable.
Here again we have only mute book entries and records. Neither Dennis Cronin nor any officer or employee of the corporation with any personal knowledge of these entries or amounts testified. Eyre had no such knowledge. Had there in fact been an arrangement between the corporation and Dennis Cronin to pay such odd amounts, equivalent to his salary witholdings, for the use of his car, and such amounts, considering the extent of such car use, would otherwise be reasonable, it would hardly constitute fraud. If these payments had been a flat $10 per week, presumably no question would have been raised. Certainly Dennis Cronin was entitled to some payment for the consistent use of his car on company business. Under the circumstances, it cannot be concluded, as defendant contends, that these book entries standing by themselves necessarily compel the inference of fraud and that they cannot be considered as representing payments for services rendered to the corporation.
Based upon the above considerations, the fraud plea directed against the corporation, insofar as it is grounded on the corporation’s books and records themselves, and the inferences which defendant contends necessarily flow therefrom, cannot be sustained.
Furthermore, even if such books and records did contain fraudulent entries, as defendant contends, it seems plain that such circumstance in itself would not automatically constitute fraud under the statute here involved. Forfeiture of a claim is provided for in the statute for corruptly practicing fraud “in the proof, statement, establishment, or allowance” of a claim against the United States. Accordingly, the mere keeping of fraudulent records in itself would not necessarily suffice. Such keeping would have to be part of a corrupt scheme for their use in an attempt to establish a claim *449 against the United States. One could, it is supposed, consciously make fraudulent entries in his books and records for certain purposes, but never intend to use such entries in the establishment of any claim he might have against the United States. Thus, reliance here on only the books and records themselves, even assuming they contained fraudulent entries, leaves defendant without any link between such records and their presentation to defendant “in the proof” of the claim against defendant.
Eyre is not such link. Despite the fact that defendant rails against his inclusion of the challenged entries in the claim and scoffs at his explanations for such inclusion, it nevertheless apparently disclaims any intention of directly accusing him of being a party to the alleged fraud. “The crux of the issue,” says defendant, “centers on the fraudulent books and records; the accusation of fraud is not against Mr. Eyre as an individual.” [68] In any event, whether or not Eyre’s attempted justifications for the inclusion of the various challenged items as proper elements of the delay-damage claim are accepted,[69] there is nothing of any substance *450 to indicate that in preparing the damage schedules he deliberately included therein as false corporate expenses any items which he knew were in fact only the personal expenses of the officers or other members of the Cronin family, and that he thereby “corruptly” practiced “fraud against the United States in the proof” of the claim.
It is true that, as he freely admitted, Eyre made some mistakes in including certain items, even under his theories of inclusion. For instance, with respect to the mortgaged properties, he inadvertently included a couple of items of expense incurred prior to the date of the bank loan agreement pursuant to which the mortgages were executed, and in one instance he included an item relating to property not so mortgaged to the bank. In handling a mass of items mistakes are understandable. In any event, simple error is not to be equated with fraud. Urbina v. United States, 192 Ct. Cl. 875, 428 F. 2d 1280 (1970).
Wagner Iron Works v. United States, 146 Ct. Cl. 834, 174 F. Supp. 956 (1959), upon which defendant relies, is inap-posite. The court there did forfeit a corporation’s termina tion claim which contained sums allegedly spent in the performance of the terminated contracts but which instead, actually had been expended for the personal benefit of the corporation’s officers. But in that case the corporation’s president, upon learning that the corporation’s books would be audited by the Federal Bureau of Investigation, confessed that a large amount of his personal expenses, including a tennis court and a paved driveway at his country home, had been paid for by the company as work seemingly performed for the company. He had prepared a false invoice so that an examination of the company’s books would make it appear that the expenditure was for a legitimate corporate purpose. Cost schedules or statements knowingly incorporating these false sums were presented to defendant under this court’s rules. For these fraudulent acts (and others), the court forfeited the corporation’s claim (despite an attempt, after the fraud became known, to substitute revised cost schedules which deleted all ascertainable personal items). *451 The substantial distinctions between that case and the instant situation are obvious.
Finally, defendant attempts to implicate the surety. As mentioned, under the plan for arrangement under the Bankruptcy Act, the surety in 1959 became the sole stockholder of the plaintiff. As such, it is the real party in interest in the prosecution of this claim and, in such connection, employed Eyre to assist it. Mr. Christian Y. Kuhn was the manager of the Eastern Division of the surety’s Bond Claim Department. In such employee capacity, he succeeded to the presidency of the plaintiff, which was kept alive for the primary purpose of prosecuting the instant claim. Defendant contends that Kuhn, while the damage schedules herein were being prepared by Eyre, became familiar with the fact that there were irregularities in plaintiff’s books but blindly avoided the truth, thus permitting fraudulent damage schedules to be filed herein.
Defendant’s contention is based upon the circumstance that one Paul E. Yance, who had been employed from October 1956 to September 1958 as plaintiff’s controller, allegedly became familiar with certain claimed irregularities in plaintiff’s books and acquainted Kuhn with them. On January 14, 1959, prior to the bringing of the instant action in this court, Yance also testified to various alleged irregularities in plaintiff’s books and records in the bankruptcy proceedings, including the accusation that the Cronin officers had charged the corporation with their personal expenses.[70] Defendant contends that despite this knowledge, Kuhn even failed to discuss the matter with Eyre or give him any instructions or warnings about possible irregularities in the books upon which Eyre was basing his damage schedules. Kuhn, says defendant, “preferred to avert his eyes and avoid any responsibility in the filing of the claim,”[71] and by so acting, he made “himself an accomplice of the Cronins. He cannot insulate the surety from the fraudulent activities of the *452 Cronins. Both the said Cronins and the surety caused the false and fraudulent claim to be filed with the defendant and the Court with the intent to defraud the United States. Their fraud is the corporation’s fraud.”[72]
This contention too is not supported by the record. Kuhn did become familiar with Vance’s charges of irregularities (including the alleged charging of personal expenses to the corporation) for which John Cronin was allegedly responsible. These charges came after Vance’s employment with the corporation had been terminated by John Cronin on September 7, 1958. On September 26, 1958 Vance gave an affidavit with respect thereto to the bank which had financed plaintiff, with which affidavit Kuhn was familiar.
For various understandable reasons, however, Kuhn remained uninfluenced by Vance’s charges. For one thing, Vance was employed by plaintiff after the completion of the instant contract and therefore had no personal knowledge of the matters here involved. All the specific incidents to which Vance referred pertained to other contracts. In addition, Vance had approached Kuhn and offered to give the surety a similar affidavit, but the circumstances under which the offer was made left Kuhn with little confidence in the accuracy of what the affidavit would contain. The offer was conditioned upon the surety’s giving Vance a sum of money. At that time Vance was in straitened financial circumstances. The surety refused to make any such payment to Vance. Kuhn was advised shortly afterward that Vance had repeated his accusations in the bankruptcy proceedings, but that his testimony had been sharply disputed. And on June 12, 1959, which was still prior to the filing of the petition herein, Vance was convicted and sentenced to prison for embezzling a sum of money from the American Legion, of which Kuhn was also advised. Under the circumstances, Kuhn cannot be faulted for concluding that the presentation of the claim to this court should be based upon Eyre’s work unimpeded by Vance’s charges. Kuhn believed that the preparation of the claim by Eyre, in whose ability and integrity *453 he had faith, and who was working under the supervision of counsel, would not result in any false or fraudulent item being knowingly included therein. There is no showing of scienter on the part of Kuhn. It is significant that at the time plaintiff’s damage schedules were prepared, both Kuhn and Eyre knew that the schedules would be subsequently checked, and that plaintiff’s books and records would be audited, by the Federal Bureau of Investigation.
Based upon the above considerations, it must be concluded that defendant has failed to meet the burden of proof cast upon it in such cases of showing .that plaintiff, either by the manner in which its original officers and stockholders caused its books and records to be kept,, or by the manner in which its successors in interest, through Kuhn and Eyre, caused the damage schedules herein to be prepared and submitted to defendant and to this court, “corruptly” practiced or attempted “to practice any fraud against the United States in the proof, statement, establishment, or allowance” of the claim herein.

 “§ 2514. Forfeiture of fraudulent claims.
“A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.
“In such cases the Court of Claims shall specifically find such fraud or attempt and render judgment of forfeiture.”

 Under the plan, the surety, by reason of its payment and performance bonds, agreed to pay creditors whose claims were secured. It further agreed that any proceeds recovered from the instant claim would be utilized to pay the claims of unsecured creditors.

 Petition, ¶ 86. Also see finding 138(b)

 Finding 141.

 Finding 137.

 Findings 131, 132, 153. In addition, tie record indicates that some time was lost due to factors for which neither party was responsible, such as weather. Finding 109(e).

 “* * * plaintiff pressed its claims before the Board on the theory that all extended contract performance time resulted from actionable fault of the defendant * * *. It is obvious that the evidence before the Board failed to establish the extent to which delays in performance were caused by any actionable acts or omissions of the defendant, and did not establish any basis for even approximating the extent of delays, if any, caused by defendant." 177 Ct. Cl. at 598, 368 F.2d at 258.

 “On this issue of the Government’s delay * * *, the heart of this case, as with some previous eases, is that, in effect, plaintiff ‘tellfs] us only the completion date as computed under the original contract, and the date of final acceptance. In this state of the evidence, we cannot determine as a fact that the work was wrongfully delayed by the Government, and if we could so determine, we would still not have the remotest notion of how much it was so delayed.’ George J. Grant Constr. Co. v. United States, supra, 124 Ct. Cl. at 205-06, 109 F. Supp. at 246.”

 Defendant’s Brief to the Commissioner, at 46-47.

 The OINCC was acting on the basis of the Information he had. However, at the same time the contracting officer in Washington, D.C., had information that the delivery of the chambers would be delayed at least until December 1951. Poster-Wheeler was having difficulty in obtaining delivery of the special steel that was required for the fabrication of the chambers. For unexplained reasons, the information that the contracting officer had failed to be relayed to the OINCC in Trenton, New Jersey.

 The plans and specifications for this project were originally drawn by an architect-engineer firm under a contract between defendant and such firm dated November 12, 1947. However, such contract was terminated and on December 12, 1950 defendant entered Into a contract with a new firm for architect-engineer services on this project. Defendant thereupon, on December 14, 1950, advertised for bids on the basis of the plans and specifications prepared by the original architect-engineer, but on January 11, 1951, because of its dissatisfaction with the plans and specifications, withdrew the invitation and reguested the new architect-engineer to review all the drawings, prepare clarifying drawings where necessary, and remove all conflicts and errors which it could discover. Before the new architect-engineer could complete this review and revision, defendant, because of the urgency of the project, decided to issue the second invitation for bids and award the contract on the basis of the drawings in their then Incomplete state, with any necessary clarifications and corrections to be made after the letting of the contract. However, bidders were not informed that there were many contract drawings which defendant expected to change. Actually, plaintiff reasonably concluded that the withdrawal of the first invitation and the issuance of the second Indicated that all major problems had been solved by the latter time and that the project was now ready for expeditious prosecution and completion in the 450 days allotted therefor, which was a tight schedule for such a project.

 The final design arrived at dropped tlie portions of the roof slab between the steel beams at the points where the bases were located. The fans required anchor bolts embedded at certain depths. Dropping such parts of the slab provided an additional thickness to support the anchor bolts.

 From the B rigs located outside the Blower Wing, in which rigs the air was refrigerated to a temperature of 23 degrees below zero, the air went through combustion air piping to the characterized valves. These valves enabled control to be maintained over the volume of air. Prom these valves the air then went through piping to the C and D rigs for either heating or cooling, and then to one of the three Test Wing buildings.

 The evidence shows that, because of the urgency of the project and defendant’s rush to release it for bids, defendant issued some specifications and drawings which it knew were deficient and which would later be corrected by change orders. See finding 134 and n. 11.

 During the same period, plaintiff, -while attempting to install the large exhaust gas piping adjacent to the exhaust gas cooler north of the Altitude Chamber House, discovered that the cooler and the characterized valves associated with it were likewise set at incorrect elevations. Plaintiff so advised defendant on May 27, 1953. Again defendant secured the performance of the necessary corrective work, and notified plaintiff on June 12, 1953 that the condition had been corrected. Between May 27 and June 12, 1953 plaintiff could not proceed with the installation of the large exhaust gas piping in the area of the cooler and the valves. The incident thus constituted a concurrent delay.

 The total additional amount of this expense, based on the extended time the equipment was required to remain on the job, is reduced by one-half because of decreased wear and tear during the delay, idle, time. Warren Brothers Roads Co. v. United States, 123 Ct. Cl. 48, 82-83, 105 F. Supp. 826, 830-31 (1952); Brand Investment Co. v. United States, 102 Ct. Cl. 40, 58 F. Supp. 749 (1944), cert. den., 324 U.S. 850 (1945).

 The amount of delay damages now claimed by plaintiff based on its 1,423-day claim is $829,625.06.

 Because of defendant’s belated objection, plaintiff could bave had the Change Order N claim considered by the court on the basis of the evidence already received and a complete trial de novo record with respect thereto. Commerce International Co. v. United States, 167 Ct. Cl. 529, 535, 338 F. 2d 81, 85 (1961), and cases cited therein.
Defendant’s motion was, with respect to the delay claims, denied in open court, the ruling being reaffirmed by a commissioner’s order filed June 27, 1963. Defendant’s request to the court to review the commissioner’s order (with respect to the delay claims) was “denied without prejudice” by the court on July 5, 1963.

 Because of the way in which this claim was originally presented to the court, the administrative record is included among the trial exhibits Introduced in evidence prior to the BianeM decision and the adoption by this court of rules pertaining to Wunderlich Act reviews.

 The facts concerning plaintiff’s delay claim based on the manner in which defendant handled the ordering of these changes, and the conclusion denying such claim, are set forth in finding 118.

 The facts concerning plaintiff’s claim for delay in the construction of the roofs resulting from the manner in which defendant handled these changes are set forth in finding 114. The discussion allowing such claim is contained in the opinion.

 The article is set forth in full in finding 7 (a).

 Joint Exhibit 3, Appellant’s Exhibit 21. One of the Navy members was Lt. Comdr. J. W. Gorman, the Resident Officer in Charge of Construction. He was the chief Government witness in this case.

 Id.

 Jt. Ex. 3, App. Ex. 22.

 The facts with respect to plaintiff’s delay claim concerning defendant’s changes in plaintiff’s original schedule of operations, and the conclusion that plaintiff is not entitled to recover thereon, are set forth in findings 10-22.

 Jt. Ex. 3, App. Hr. 23.

 Jt. Ex. 3, App. Ex. 24.

 See finding 155.

 PI. Ex. 823.

 Jt. Ex. 4, Bu. Ex. B — 14.

 Jt. Ex. 3, App. Ex. A-26 at 2.

 Pl. Ex. 810 at 15 ; PI. Ex. 811-G at 2.

 PI. Ex. 811-G at 2.

 PI. Ex. 811-G at 2b, 2c.

 PI. Ex. 810 at 13.

 PI. Ex. 810 at 14.

 PI. Ex. 810 at 15.

 In tbe proceedings before tbe ASBCA, plaintiff moved (Pi. Ex. 822) for production of tbe Randig Board report, as well as all proceedings before and submissions to it, but tbe ASBCA sustained tbe Bureau’s objection to tbe motion. (PI. Exs. 823 — 827). Plaintiff contends that tbe action of tbe ASBCA resulted from incorrect information given it by the Bureau (i.e., that in no instance did the additional amount allowed by tbe contracting officer’s second *428 decision equal the amount recommended by the Randig Board) and that the ASBCA’s action was therefore unjustifiable and prejudicial to plaintiff. (Pet., ¶138). Howevex-, the Randig Board report was made available by defendant as part of the trial proceedings herein and introduced in evidence as plaintiff’s Exhibit 810, the exhibits attached thereto and in fact being a part of the report being separately introduced as plaintiff’s Exhibits 811-A— 811-G. The computation submitted by the ROICC to the Randig Board was introduced in evidence by the Government as Bureau Exhibit B-14 in the ASBCA hearing, and the relationship between such computation and the allowance by the contracting officer was explained by the ROICC in his testimony at the hearing.
Plaintiff contends that when it consented to a review of the Change Order N claim on the basis of the administrative record, it was with the understanding that the Randig Board report and the exhibits annexed thereto could be considered by the court, although not in the administrative record before the ASBCA. Apparently defendant does not contest this contention since it too refers to such report in its consideration of this claim. Consequently, such report (and exhibits annexed thereto) have here been so considered.

 The discrepancy of $5,804.85 comes about because of an allowance of an item of claim in such amount, the allowance being designated in the contracting officer’s decision as “for additional labor in connection with the redesigned foundations of the outside pipe supports which was not allowed in Change ‘N’,” which is the identical language used by the contracting officer on the other items in his decision which the parties agree do refer to Proposals 14 and 18. It is this language upon which defendant relies. Plaintiff contends, however, that this $5,804.85 item actually refers to a completely different matter. Plaintiff points to the fact that the part of the contracting officer’s decision making the allowance in question applies it to a claim by plaintiff in its September 3, 1954 submission to the Randig Board in the amount of $25,211.78, and that reference to such claim in such document clearly shows that it refers to “Proposal No. 4’’ (PI. Ex. 811 — F). Confusion seems to have arisen from the fact that Proposal No. 4 also pertained to “Outside Pipe Supports,” because both Proposals 4 and 14 are listed under such heading in plaintiff’s claim. (Id. at 4). However, the outside pipe supports to which Proposal No. 4 was directed are these between the Blower Wing and the Test wing (id. at 7), and not those north of the Test Wing, to which Proposal No. 14 was directed. It would therefore appear to be clear that plaintiff is correct in this controversy and that the contracting officer inadvertently erred in describing the item as an additional allowance “not allowed in Change ‘N’,” although technically, of course, it is true that such amount was not allowed in Change Order N because such change order was not addressed to that item at all.

 See defendant's admission in this respect in its “Brief and Exceptions on Plaintiff’s Change Order N Claim” at 10.

 Jt. Ex. 3, App. Ex. A — 37.

 Jt. Ex. 3, App. Ex. A — 25.

 PI. Ex. 82S.

 Id.

 The hearings also involved the question of the proper overhead rate applicable to certain change orders. The stipulation also set forth the amount plaintiff -would be entitled to on such change orders (not including Change Order N) in the event the Board sustained plaintiff’s contention that it was entitled to additional overhead.

 PI. Ex. 815.

 Id. at 10-11.

 Id. at 11.

 Id. at 11.
The claim for additional overhead on certain change orders was sustained in part in the amount of $13,389.55. All of plaintiff’s other claims were considered as being claims for delay and were dismissed for lack of jurisdiction.

 Pet., ¶ 140.

 PI. “Reply Brief on Claim for Additional Compensation under Change Order N” at 4.

 Id. at 3.

 Id. at 13.

 Id. at 19.

 Since a radical or drastic change may, however, be more likely to cause increased costs in the performance of unchanged work, such nature of the change may, of course, be considered as an evidentiary matter in determining whether the change did in fact cause such increased costs. See, for instance, the court’s reference to the “significant change in design” in Merritt-Chapman & Scott Corp. v. United States, supra, 192 Ct. Cl. at 852, 429 F. 2d at 432.

 The Board made no finding on the point. However, at least with respect to the roofs, the record demonstrates that the contention is clearly erroneous. Increasing the thickness of the limited portions of the roof slab constituting the bases for the equipment left the much greater remaining portions of the slab in the same condition as called for in the original plans, t.e., four inches, with the work pertaining thereto being almost entirely unaffected by the changes. As the ROICC testified:
“I think the first point to be made here is that these changes in the brine pump house roofs didn’t change the entire roof, but just certain panels or certain pads on the top of the roofs. What was done, in effect, was either a change in dimension of the pad, perhaps, or a thickening of the roof slab which, in either case, I would not say, with the possible exception of the thickening of the slab which might have required some additional shoring, other than that point I think we are talking about the same degree of difficulty.
“If we are talking about a pad that has had its dimension increased by four inches on a side, in my opinion that is not a major change which could be clarified [sic (probably should be “classified”)] as increasing complexity. It is merely additional work.” [Bd. Transcript at 555-56 (Jt. Ex. 1-E) ]
The photograph introduced in evidence before the Board as Bureau Ex. B-l (in Jt. Ex. 4 in this court) shows the relatively limited area of the roofs taken up by the bases.

 Although it argues that there was no such complete change as plaintiff contends was effected, defendant nevertheless agrees that plaintiff’s theory would be proper “if the changed work were completely dissimilar from the original work,” and cites Keco Industries, Inc. v. United States, 176 Ct. Cl. 983, 999-1002, 364 F. 2d 838, 848-50 (1966), cert. den., 386 U.S. 958 (1967), as justification for its concession. (Def. “Brief On Plaintiff’s Claim For Additional Compensation For Change Order N” at 20) Defendant errs. ICeco Industries was an entirely different situation. It involved the substitution of less expensive electric refrigeration units for gas refrigeration units. Accordingly, the calculation of the equitable adjustment involved the amount of the credit due defendant. Plaintiff was suffering a manufacturing loss on both units. The court concluded that the equitable adjustment should be calculated so as to maintain the same loss on the substituted electric units as was represented by the previous net loss incurred in manufacturing both units. (Of course, in calculating such loss, one factor had to be the contract price.) Thus the court preserved “the same unit loss which plaintiff would have had if there had been no change order” [id. at 1002, 364 F. 2d at 850], which is the basic rule here applied.

 PI. Brief on Merits and Damages at 70.

 Bd. Tr. at 525 (Jt. Ex. 1-E).

 Nor has defendant here filed any counterclaim with respect to any amounts paid to plaintiff concerning the changes here involved.

 See Bureau Brief in PI. Ex. 828.

 Id. at 21.

 Id. at 29.

 See n. 1.

 One bill was for expense related to a boat owned by John Cronin which Eyre testified he knew was sometimes used for business entertainment purposes.

 The charges to the instant contract of such items ended on August 27, 1953. Thereafter, such travel expense -weekly payments, which were in larger amounts and not equal to his salary withholdings, were charged to other projects.

 Def. “Reply to Plaintiff's Objections to Defendant's Requested Findings of Fact on tie Fraud Plea” at 4. With respect to plaintiff’s defense of Eyre, defendant further comments: “Plaintiff’s objections [to defendant’s requested findings on the fraud plea] seek to confuse the issue. Defendant is not taking issue -with the use by plaintiff of the services of Mr. Eyre. Defendant’s plea in fraud is directed to the books and records of the corporation and to the matter of the nature of the expenses made by the corporation. Plaintiff's attempt to relate the issue to Mr. Eyre as an individual is misplaced.” Id. at 3.
Vet, with apparent inconsistency, defendant in its brief to the commissioner argues that although Eyre knew “of the irregularities in the books of the plaintiff corporation” [at 80], he nevertheless blindly relied on such books, justifying the inclusion of the entries in the claim by “elaborate explanations” [at 81], and that his “whole performance was one of reckless disregard for the truth which is tantamount to fraud.” Id.

 Actually, the bulk of the challenged items have not been so allowed, principally because there is a failure of proof with respect to the assumptions made by Eyre In including the items as proper corporation expenses. For Instance, there is nothing in the corporate records to support Eyre’s assumption that there must have been some kind of agreement that the corporation would assume some undefined portion of the expenses of maintaining and operating the private homes of the Cronins which had been mortgaged for the benefit of the corporation, and this is so regardless of how reasonable it would appear to Byre for such an agreement to have been made. As stated. Byre was in effect guessing as to the existence of such an agreement upon which he based the validity of the items as proper corporate expenses, and guesswork is not a proper basis for assessing damages.
However, by appropriate evidence, plaintiff was able to show that some challenged items were in fact proper items of damage (i.e., taxes levied by the City of Newark on personal property in premises either owned or leased by plaintiff and utilized as plaintiff’s home office).

 Vance also testified at the trial herein to an alleged corporate practice of making reimbursements to certain employees of the tax withholdings on their salaries.

 Def. Requested Findings of Fact at 118.

 Def. Brief at 82.